**In re Frank Wayne BURGSTALER and Margie Lee Burgstaler, d/b/a Kenny's Oil Company, Debtors.**

**WESTERN PETROLEUM COMPANY, Plaintiff,**

v.

**Frank Wayne BURGSTALER and Margie Lee Burgstaler, d/b/a Kenny's Oil Company, Defendants.**

**Bankruptcy No. 5–85–40.
Adv. No. 5–85–17.**

United States Bankruptcy Court,
D. Minnesota,
Fifth Division.

March 14, 1986.

John N. Nys, Duluth, Minn., for plaintiff.

Charles L. Nail, Jr., Minneapolis, Minn., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

The above-captioned matter came on before the undersigned United States Bankruptcy Judge for trial on February 20, 1986. Plaintiff appeared by its attorney, John N. Nys. Defendants Frank Wayne Burgstaler and Margie Lee Burgstaler (hereinafter "Debtors") appeared personally and by their attorney, Charles L. Nail, Jr. Upon the evidence adduced at trial, post-trial written arguments, and all of the other files, records, and proceedings herein, the Court has determined that Debtors' debt to Plaintiff is dischargeable in bankruptcy.

### FINDINGS OF FACT

Debtors filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code in this Court on February 8, 1985. On that date they operated a retail dealership of bulk heating oil, gasoline and other petroleum products in Merrifield, Minnesota, under the assumed name of "Kenny's Oil Company".[1] Plaintiff is a wholesaler and marketer of petroleum products and was one of Debtors' two chief suppliers during the period from May, 1984, until February, 1985. The events giving rise to this adversary proceeding for determination of dischargeability occurred during the two weeks immediately preceding the filing of Debtor's bankruptcy Petition, and center around five checks given by Debtors to Plaintiff in payment for petroleum products delivered to them during that period.

Debtors started buying petroleum products from Plaintiff in May, 1984. Debtors never applied for any formal credit arrangement from Plaintiff; as a result, they were placed on a "strict C.O.D." basis for all purchases of petroleum products. Under the arrangement, Debtor Frank Burgstaler would call in an order for a specific amount of oil or gas to Plaintiff's Minneapolis office. Plaintiff's sales representative would then make arrangements with Loxtercamp Transport, an independent trucking firm, to pick up the ordered quantity of gas· or oil from Williams Pipeline Company's terminal at Alexandria, Minnesota. Loxtercamp was employed and paid by Debtors, as Plaintiff's sale terms

---

**1.** Debtors no longer operate the bulk heating oil segment of their business, having entered into a contract for sale of it which is conditional upon confirmation of their Plan of Reorganization. They continue to operate a convenience store, bait shop, gasoline station, and furnace repair business.

were "F.O.B. Alexandria". Upon arrival at Debtors' station, the Loxtercamp driver would first take Debtors' two checks in full payment for the petroleum products and Loxtercamp's hauling charges; and only then would he unload the gas or oil. The Loxtercamp driver would then forward Plaintiff's check to Plaintiff's main office. Plaintiff and Debtors followed this procedure all the way through a final purchase on February 8, 1985.

Debtors' business experienced great cash flow difficulties throughout all of 1984 and early 1985.[2] These difficulties led to the accumulation of a debt in excess of $100,-000.00 to Chitwood Oil, Debtors' other major supplier. Chitwood Oil obtained a judgment against Debtors in state District Court in early 1984. At some point in 1984, Debtors knowingly began to regularly issue checks for amounts substantially over the current daily balance in their business checking account at American National Bank of Brainerd. They did this with the acquiescence of bank officers, and apparently because their daily income flow was increasingly insufficient to meet their business expenses. When large checks would come in, or when the negative account balance would increase to an "unacceptable" level, a bank officer would call Debtors and request that they deposit sufficient funds to reduce the negative balance. Throughout the summer and fall of 1984 and the winter of 1984–5, this occurred on at least a semi-weekly basis, generally when the large checks payable to Debtors' current petroleum suppliers were presented for payment.

The bank statements for Debtors' business checking account for the period from August 1, 1984, through January 24, 1985, show that this account had a negative balance on 86 of the 121 banking business days noted on them. Debtors' own check register for the same period shows a negative balance for *all* of the 177 calendar days in this period. As a result, debtors incurred substantial overdraft charges, sometimes in excess of $200.00 per day. Debtors continued this practice up through the date they filed their Petition in this Court.[3] Both Debtors testified that they never gave a check with the intent to deprive the payee of the funds, and that every time they gave a check, they did so with the intent to deposit sufficient funds to cover it when requested by their bank.

Debtors' financial situation became critical in early January, 1985, after Chitwood Oil scheduled a judgment execution sale of their business assets for February 11, 1985. They continued to operate as usual, but realized that some legal step had to be taken to prevent the loss of their business. In mid-January, 1985, they first consulted counsel from the law firm which represents them in their Chapter 11 case, for the purpose of attempting a workout of their judgment debt to Chitwood Oil. It appears that counsel discussed the prospect of a bankruptcy filing with Debtors at this first meeting, though it was discussed only as a second-priority alternative to a out-of-court workout or structured repayment. Debtors formed no firm intention to file for bankruptcy after this meeting. Counsel scheduled a meeting with Harold Chitwood and his Brainerd attorney for February 8. On February 7, Debtors met with counsel and executed documents sufficient to make a "short form" bankruptcy filing if the negotiations proved unfruitful. Both Debtors and their counsel were confident that some structured repayment could be negotiated at the meeting. The meeting took place at Chitwood Oil's attorney's offices at around noon on February 8. Harold Chitwood refused to negotiate any terms other

---

**2.** Debtors' Disclosure Statement attributes these difficulties in large part to an assumed embezzlement of over $100,000.00 by a former employee.

**3.** In response to the Court's questioning, Debtor Frank Burgstaler testified that Debtors did *not* carry on this practice out of fear of garnishment of this account by Chitwood Oil. Debtors did

not testify to the reason why they continually maintained a negative balance, though one logical inference is that they did so because the business was desperately cash-poor during this entire time and they were trying to take advantage of the "float" period between issuance and presentment of a check.

More than immediate payment in full; the parties parted ways. Only during consultation with counsel after the meeting did Debtors firmly resolve to proceed in bankruptcy; they filed their Petition in this Court at about 4:30 that afternoon.

From January 25 until February 8, 1985, Plaintiff made five sales of bulk oil products to Debtors. Debtors paid for each one by check. A summary of the sales and checks given is as follows:

| Date of Delivery | Sale | Checks Given | Date of Check[4] |
|---|---|---|---|
| January 26, 1985 | $7,124.50 | $7,124.50 | January 25, 1985 |
| February 4, 1985 | 6,617.03 | 6,617.03 | February 1, 1985 |
| February 4, 1985 | 5,239.00 | 5,239.00 | February 4, 1985 |
| February 7, 1985 | 7,210.63 | 7,210.63 | February 6, 1985 |
| February 8, 1985 | 6,794.99 | 6,794.99 | February 7, 1985 |

At no time relevant to the five deliveries did either Debtor advise the Loxtercamp driver or any of Plaintiff's employees that they did not have sufficient funds in their account on that date to cover the checks which they were tendering in payment. In issuing the checks Debtors were following their past practice and intended to make deposits to cover them upon bank officers' request. Debtors had done this with numerous other checks given to Plaintiff throughout their dealer-customer relationship and had never "bounced" a check to Plaintiff before.

When Debtors filed their bankruptcy Petition, they were not advised by counsel that they were required to open a new "debtor in possession" checking account immediately. On Monday, February 11, 1985, counsel advised them to close their old account and open the new account. They did so immediately. As a result, the five checks which they had issued to Plaintiff for the deliveries between January 24 and February 7 were returned for insuffi-

cient funds. Plaintiff has received none of the funds represented by these checks. Debtors propose to treat their obligation to Plaintiff on these transactions as an unsecured claim in their Plan of Reorganization.

## CONCLUSIONS OF LAW

Plaintiff seeks to have Debtors' obligation for the five deliveries of petroleum products found nondischargeable in bankruptcy[5] under the following provisions of 11 U.S.C. § 523:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

.    .    .    .    .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

.    .    .    .    .

4. Apparently Debtors made out checks to pay for the petroleum as soon as they ordered it, even though delivery did not always take place on the date Debtors placed an order.

5. Debtors have proposed a Plan of Reorganization under which Plaintiff's claim would be treated as an unsecured claim and would ultimately receive 20% of the allowed amount. If Debtors' Plan is confirmed, the portion of Plaintiff's claim above the amount which Debtors propose to pay through the Plan will be discharged upon confirmation. 11 U.S.C. § 1141(d)(1)(A); 5 COLLIER ON BANKR. ¶ 1141.01 at 1141–3 (15th ed. 1985). As a result,

the terms of Debtors' Plan for treatment of Plaintiff's claim would supplant the prepetition rights which Plaintiff had against Debtors. If, however, Debtors' debt to Plaintiff is nondischargeable under § 523, Plaintiff's claim will not be discharged upon confirmation of Debtors' Chapter 11 Plan. 5 COLLIER ON BANKR. ¶ 1141.01[4][a] at 1141–9 (15th ed. 1985). A hearing on confirmation of Debtors' Chapter 11 Plan was held on March 12, 1986; the Court heard objections to confirmation and will take the matter under advisement upon submission of written arguments.

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; . . .

The petitioning creditor under both of these provisions must prove all elements by clear and convincing evidence. *In Re Schwartz*, 44 Bankr. 266, 269 (D.Minn. 1984); *In Re Pommerer*, 10 Bankr. 935, 938 (Bankr.D.Minn.1981); *In Re Egan*, 52 Bankr. 501, 506 (Bankr.D.Minn.1985); *In Re Hames*, 53 Bankr. 868, 871 (Bankr.D.Minn.1985). The Court will treat the two grounds separately.

### A. § 523(a)(2)(A): False Pretenses, False Representations or Actual Fraud.

■ Plaintiff has based its challenge to dischargeability primarily upon 11 U.S.C. § 523(a)(2)(A). In this District, the elements which must be proven thereunder are as follows:

1. The obtaining of money, property, services, or an extension, renewal, or refinance of credit by a debtor,

2. Using a false representation pertaining to a past or present fact,

3. With knowledge of the representation's falsity, or its assertion as fact and reckless disregard for its truth or falsity,

4. And an intention to deceive the other party or to induce the other party to act upon the representation,

5. Reasonable reliance by the creditor upon the misrepresentation, and

6. Resultant detriment to the creditor.

*In Re Pommerer* at 939; *In Re Johnson*, 40 Bankr. 756, 758 (Bankr.D.Minn.1984); *In Re Hames* at 871.

Plaintiff has proven two elements beyond dispute. First, there is no question that Debtors obtained bulk oil products from Plaintiff of a value of $32,986.15 as a result of this sequence of events. Second, there is no question that Plaintiff did not

receive money in this amount from Debtors, because the checks were returned. Plaintiff has proven the first and last elements under § 523(a)(2)(A).

■ Analysis of the remaining elements must begin with the recognition that the giving of an N.S.F. check is not *per se* conclusive evidence of fraud. *In Re Barnacle*, 44 Bankr. 50, 53 (Bankr.D.Minn. 1984).[6]

■ The first question to be addressed is whether in tendering the checks the Debtors were making a "false representation pertaining to a past or present fact". The Courts have not agreed as to whether the mere giving of an ultimately-dishonored check, *without more*, constitutes an actionable representation under § 523(a)(2)(A). On the one hand, a number of Courts have held that the tender of a check is an implied representation by the issuer that there are funds available to honor the check when presented. *In Re Kurdoghlian*, 30 Bankr. 500 (Bankr. 9th Cir.1983); *In Re Anderson*, 10 Bankr. 296, 297 (Bankr. W.D.Wis.1981); *In Re Tabers*, 28 Bankr. 679, 680 (Bankr.W.D.Ky.1983); *In Re Mullin*, 51 Bankr. 377, 378 (Bankr.S.D.Ind. 1985). On the other, a number of Courts have applied provisions of Article 3 of the Uniform Commercial Code and the U.S. Supreme Court decision of *Williams v. United States*, 458 U.S. 279 (1982) to hold that a bank check is not a statement of financial condition or a representation as to whether the check would be honored upon presentment. *In Re Paulk*, 25 Bankr. 913, 917 (Bankr.M.D.Ga.1982); *In Re Hunt*, 30 Bankr. 425, 437 (M.D.Tenn.1983); *In Re Younesi*, 34 Bankr. 828, 829 (Bankr.C.D. Ca.1983); *In Re Hammett*, 49 Bankr. 533, 534-5 (Bankr.M.D.Fla.1985).

*Williams v. United States* involved a conviction for violation of 18 U.S.C. § 1014,

---

**6.** In so holding, the *Barnacle* Court cited *In Re Collins*, 28 Bankr. 244, 247 (Bankr.W.D.Okla. 1983) for this proposition. The holding in *Collins* was somewhat narrower: "[a]n NSF check alone is not conclusive evidence *of an intent to defraud* within § 523(a)(2)(A)". *Id.* [emphasis added.] The *Collins* Court thus appeared to

treat only the issue of the scope of required proof for the intent element. However, as will be seen, on the basis of the rationale adopted today the mere giving of an N.S.F. check is not sufficient in itself to satisfy any of the other elements. *See also In Re Sutton*, 39 Bankr. 390, 397 (Bankr.M.D.Tenn.1984).

which prohibits the making of a "false statement or report" for the purpose of influencing actions or decisions by a federally-insured bank. The defendant in *Williams* had engaged in "check-kiting", under which he effectively obtained the interest-free use of bank funds by consecutively depositing N.S.F. checks and then reissuing other ones, using several accounts in a circular fashion. To support the conclusion that this conduct was not proscribed by the statute, Justice Blackmun noted:

> Although petitioner deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a "false statement" for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false". Petitioner's bank checks served only to direct the drawee banks to pay the face amounts to the bearer, while committing petitioner to make good the obligations if the banks dishonored the drafts. Each check did not, in terms, make any representation as to the state of petitioner's bank balance.

458 U.S. at 284–5. Those Bankruptcy Courts considering the impact of *Williams* in the dischargeability context have held that, at the very least, *Williams* seriously impairs a Bankruptcy Court's ability to classify the mere giving of a bad check as a representation. *In Re Younesi* at 829; *In Re Hammett* at 534–5. Some Courts have required proof of additional, independent representations of the state of the account balance or the soundness of the debtor's financial condition. *See, e.g., In Re Hunt* at 438. *See also In Re Anson*, 9 Bankr. 741 (Bankr.W.D.Mo.1981); *In Re Collins*, 28 Bankr. 244 (Bankr.W.D.Okla.1983); *In Re Sutton*, 39 Bankr. 390 (Bankr.M.D. Tenn.1984) (all reaching same conclusion without explicitly considering *Williams*).

Under the Minnesota enactment of Article 3, a check does not operate as an immediate assignment of funds in the hands of the drawee available for its payment, and the drawee bank is not liable on the instrument until the payee presents it and the drawee accepts it. MINN.STAT. § 336.3–409(1). *See, in general, In Re Ramy Seed Co.*, 57 Bankr. 425, 428–30, (Bankr.D.Minn. 1985). A check is a draft drawn on a bank and payable on demand, MINN.STAT. § 336.3–104(2)(b), which contains an unconditional promise or order to pay a sum certain in money, MINN.STAT. § 336.3–104(1)(b). Under Article 3, the drawer contracts with the holder that, upon dishonor and any necessary notice of dishonor or protest, the drawer will pay the amount of the draft to the holder. MINN.STAT. § 336.3–413(2). Article 3 imposes no warranty that the drawer's account contains sufficient funds to pay the check upon presentment.

This split in the cases presents a troublesome question. On the one hand, Justice Blackmun's logic in *Williams v. U.S.* and the underlying Article 3 provisions present a coherent theoretical basis for the conclusion that the giving of a check is no representation as to whether it will be honored or not. Too, the Supreme Court considered and rejected the argument that the drawer of a check "is generally understood to represent that he 'currently has funds on deposit sufficient to cover the face value of the check'". 458 U.S. at 285–6. On the other hand, *Williams* was decided in the context of a criminal prosecution under a statute which did not specifically describe the conduct involved; the Court ultimately based its ruling on its historical reluctance to expansively construe criminal statutes delineating the proscribed activity. 458 U.S. at 286 and 290. In the context of a civil dispute between the parties to a check the argument that the tender of the check is not accompanied by an implied representation of its soundness is much less compelling.

The facts of this case do not require the Court to determine whether Plaintiff has proved up the second element of the test (or the third and fifth elements, which in a given case are to some degree dependent upon the scope and nature of the represen-

tation that was allegedly made).[7] Plaintiff has failed to prove that Debtors ever acted with the specific intent to deprive Plaintiff of property by giving a check which they knew would be worthless when presented for payment. *See In Re Jenes,* 18 Bankr. 405, 408 (Bankr.S.D.Fla.1981); *In Re Hammett* at 535. First, the Court cannot infer on the basis of MINN.STAT. § 609.535 that Debtors intended that the checks should not be paid.[8] First, Plaintiff did not prove that it ever mailed the "notice of nonpayment or dishonor" contemplated by that provision. Second, for dischargeability purposes a showing of the "fraud implied in law" contemplated by MINN.STAT. § 609.535 is not sufficient; a showing of actual fraud involving moral turpitude is required. *In Re Pommerer* at 939; *In Re Anderson* at 298.

The focus therefore must be on Debtors' actual state of mind at the time they gave the five checks to the Loxtercamp driver. While the evidence amply demonstrates that Debtors gave the Loxtercamp driver checks which they knew were not backed by sufficient funds at that moment, it does not demonstrate that they had any intent to permanently deprive Plaintiff of the value of its products by giving checks which would be worthless when presented for payment. The Court does not and cannot approve of Debtors' prepetition practice of continually running an underfunded checking account and issuing large numbers of checks which would not have been honored if presented immediately. This practice was irresponsible to Debtors' trade creditors. It was also prejudicial to the continuing stability of Debtors' business operations; if at any point Debtors' bankers had abruptly ceased to accommodate them, the arrangement which Debtors had jerry-built would have quickly collapsed, and they may possibly have been put out of business. However, Debtors had carried on under this system for over six months— and their bank had honored all of the checks tendered under identical circumstances to Plaintiff prior to the five which are in question here. While Debtors are definitely not to be saluted for doing so, they were merely relying upon their past success in juggling cash and bank account funds in tendering these five checks. A finding of reliance by the debtor on similar arrangements has cut against a finding of fraudulent intent in other cases. *See In Re Paulk; In Re Collins; In Re Hammett; In Re Barnacle.* The dishonor of the five checks was proximately caused by hasty and inadequate planning for the eventuality of a bankruptcy filing, which led to the

---

**7.** The facts of this case present a potential issue which was not directly argued or briefed by either party. The Courts in prior dischargeability cases involving N.S.F. checks have focused on the giving of the check as a representation that there were sufficient funds in the account *as of the date and time when the check was given.* There is no question in this case that Debtors did not have sufficient funds in the account as of the date on which any of the checks in question was given. Debtors could have argued that the only implied representation which they could have ever intended to make was that there would be sufficient funds in the account to cover the checks *when presented.* Consideration of such arguments points out the difficulty of perfunctorily holding that the giving of a check is a representation that there "are" sufficient funds in the account. Though the spread of "electronic banking" will make inroads upon it, the use or abuse of the "float" is an established fact of commercial life in the 1980's.

**8.** MINN.STAT. § 609.535 provides in pertinent part as follows:

Subd. 2. Acts constituting. Whoever issues a check which, at the time of issuance, he intends shall not be paid, is guilty of a misdemeanor . . .

Subd. 3. Proof of intent. Any of the following is evidence sufficient to sustain a finding that the person at the time he issued the check intended it should not be paid:

(1) proof that, at the time of issuance, he did not have an account with the drawee;

(2) proof that, at the time of issuance, he did not have sufficient funds or credit with the drawee and that he failed to pay the check within five business days after mailing of notice of nonpayment or dishonor as provided in this subdivision; or

(3) proof that, when presentment was made within a reasonable time, the issuer did not have sufficient funds or credit with the drawee and that he failed to pay the check within five business days after mailing of notice of nonpayment or dishonor as provided in this subdivision.

precipitous closing of the prepetition account. It was not proximately caused by any fraudulent intent on Debtors' part.

█ The Court acknowledges that this result is harsh on Plaintiff; after all, it supplied Debtors with petroleum inventory, part of which got them through the initial days of their Chapter 11 case. However, this Court is under a mandate to strictly construe exceptions to discharge. *Gleason v. Thaw*, 236 U.S. 558 (1915). A judgment of nondischargeability under § 523(a)(2)(A) must be supported by a finding of "deceit, artifice or trick which involves a direct and active operation of intellect which is designed to mislead". *In Re Pommerer* at 939. The evidence simply fails to support a finding that Debtors acted with a state of mind of this level of culpability. *See, e.g., In Re Collins* at 248; *In Re Hammett* at 535.

### B. § 523(a)(6): Willful and Malicious Injury.

Plaintiff also pleaded 11 U.S.C. § 523(a)(6) as a ground for a judgment of nondischargeability. The applicability of § 523(a)(6) is arguably limited to cases involving intentional torts where fraud is not an element. Plaintiff's counsel acknowledges that the facts are more appropriately analyzed under § 523(a)(2)(A), but nonetheless Plaintiff has not dismissed the count of its Complaint pleading § 523(a)(6). Some discussion is therefore appropriate, though in view of the Court's conclusions under § 523(a)(2)(A) it need not be extended.

█ To establish nondischargeability under § 523(a)(6), the petitioning creditor must establish that the debtor inflicted injury upon him while acting with a state of mind both willful and malicious. *In Re Egan*, 52 Bankr. 501, 506 (Bankr.D.Minn. 1985). "Willful" means "deliberate or intentional"; a showing that a debtor acted intentionally in bringing about the injury—and not negligently or "accidentally"—establishes "willfulness". H.R.REP. No. 595, 95th Cong., 1st Sess. 363 (1977); S.REP. No. 989, 95th Cong., 2nd Sess. 77-

79 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787, 5863, 6319; *In Re Egan* at 506. Assuming that § 523(a)(6) is applicable, the Court concludes that Plaintiff has proven this element. Debtors knew what they were doing in performing the basic act of tendering a check which was not backed by deposited funds as of tender.

The element of "malice" further restricts the range of situations which give rise to a nondischargeable debt under § 523(a)(6). The Eighth Circuit recently held that "a heightened level of culpability must be found" to merit a finding of malice under § 523(a)(6). *In Re Long*, 774 F.2d 875, 881 (8th Cir.1985). In the context of a debtor's alleged conversion of secured collateral, the Circuit equated malice with conduct "targeted at the creditor ..., at least in the sense that the conduct is certain or almost certain to cause financial harm". *Id.* Again assuming the threshold applicability of § 523(a)(6) to this case, the Court concludes that Plaintiff has not proven the element of malice. The Eighth Circuit indicates that the Bankruptcy Court may consider "the likelihood of harm in an objective sense" in evaluating a debtor's state of mind. *Id.* The evidence fails to demonstrate that there was a certainty or near-certainty of damage to Plaintiff stemming from Debtors' tender of N.S.F. checks. Debtors intended to follow through on their past practice to make the checks good upon presentment; their failure to do so was due to the intervening closing of the account, rather than an intentional withholding of deposits. Again, the Court simply cannot conclude that Debtors acted with a state of mind of such degree of culpability as to support nondischargeability under § 523(a)(6).

### CONCLUSION

Because Plaintiff has failed to prove all of the elements of §§ 523(a)(2)(A) and 523(a)(6) by clear and convincing evidence, its exception to the discharge of Debtors' debt to it must be denied.

**516**

## ORDER FOR JUDGMENT

Based upon the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDER, ADJUDGED AND DECREED that Debtors' debt to Plaintiff in the sum of $32,986.15 shall not be excepted from discharge in bankruptcy.

LET JUDGMENT BE ENTERED ACCORDINGLY.