In the Matter of Phillip Edward
ETHRIDGE, Debtor.

DOUG HOWLE'S PACES FERRY
DODGE, INC., Plaintiff,

v.

Phillip Edward ETHRIDGE, Defendant.

Bankruptcy No. 85–30168.
Adv. P. No. 85–3031.

United States Bankruptcy Court,
M.D. Georgia,
Athens Division.

Dec. 15, 1987.

Glenn S. Bass, Atlanta, Ga., for plaintiff.

John E. Kardos, Athens, Ga., for defendant.

MEMORANDUM OPINION ON COMPLAINT OBJECTING TO DISCHARGE AND TO DETERMINE DISCHARGEABILITY OF DEBT

ROBERT F. HERSHNER, JR., Chief Bankruptcy Judge.

## STATEMENT OF THE CASE

On July 21, 1985, Phillip Edward Ethridge, Defendant, filed a petition for relief under Chapter 7 of the Bankruptcy Code. In Defendant's schedule of debts, Doug Howle's Paces Ferry Dodge, Inc., Plaintiff, is listed as an unsecured creditor holding a claim in the amount of $108,981.44. The claim is based upon a consent judgment entered against Defendant on October 24, 1984 in the Superior Court of Clarke County. On October 15, 1985, Plaintiff filed a complaint objecting to Defendant's discharge,[1] or alternatively, requesting the Court to determine the debt to be nondischargeable.[2] Defendant filed an answer and a counterclaim on November 18, 1985. In his counterclaim, Defendant requests costs and attorney's fees under section 523(d) of the Bankruptcy Code[3] and under

---

1. *See* 11 U.S.C.A. § 727 (West 1979 & Supp. 1987).

2. *See* 11 U.S.C.A. § 523 (West 1979 & Supp. 1987).

3. 11 U.S.C.A. § 523(d) (West Supp.1987).

Rule 11 of the Federal Rules of Civil Procedure.[4] By leave of the Court, Plaintiff was allowed to file a late response to this counterclaim on December 26, 1985.

The complaint and counterclaim came on for trial on January 20, 1987. The Court, having considered the evidence presented at trial and the briefs of counsel, now publishes its findings of fact and conclusions of law.

## FINDINGS OF FACT

Defendant was the president and a shareholder of Southern Motor Coach, Inc. (Southern Motor). Southern Motor was engaged in the business of manufacturing, selling, and promoting conversion vans. Defendant had several years of experience in the conversion van business prior to his association with Southern Motor.

Following its incorporation in 1982, Southern Motor established a floor plan line of credit at First American Bank and Trust Company (First American). The ceiling for the credit line was set at $200,000. In order to secure this credit, Defendant and two other shareholders and their wives personally guaranteed the corporation's credit line, using their houses as collateral. Under the floor plan, First American would loan Southern Motor the money to purchase shell vans in the open marketplace. The vans were usually purchased from a dealer who was paid by a corporate check, a cashier's check, or an automatic draft. First American would activate the credit line when it was presented with either the certificate of title to the van or a manufacturer's statement of origin.

Mr. Cheek, the president of First American, testified that the Southern Motor line of credit operated in a fashion similar to overdraft protection, although technically the credit terms did not include overdraft protection. Mr. Cheek stated that when First American received a check drawn on the Southern Motor account for which there were insufficient funds, the normal procedure would be for First American to notify Southern Motor of the overdraft.

First American would then hold the check for a period of twenty-four hours in order to allow Southern Motor to make arrangements to activate the credit line.

Southern Motor operated in excess of its credit limit for a number of years. Although First American warned Southern Motor to reduce the credit line, First American continued to allow Southern Motor to operate under the credit line when the line was as high as $400,000 and $500,000. Eventually, First American elected to close Southern Motor's line of credit. Mr. Cheek testified that under normal procedures, First American would notify a customer about the closing of a line of credit in writing; however, Southern Motor was notified via telephone.

Defendant was in Oklahoma at the time First American closed Southern Motor's line of credit. Defendant received two phone calls during this time regarding the financial state of Southern Motor. First, Defendant received a call from Mr. Gersten, a shareholder and secretary-treasurer of Southern Motor. Defendant testified that Mr. Gersten handled the day-to-day financial affairs of the corporation. Mr. Cheek stated that First American normally transacted business with Southern Motor through Mr. Gersten. Mr. Gersten informed Defendant of the action taken by First American and of the financial status of Southern Motor. Mr. Gersten also informed Defendant that he was resigning from the corporation effective immediately.

Defendant received a second phone call from Mr. Doug Howle, president and one-half owner of Plaintiff. Mr. Howle informed Defendant that six checks issued by Southern Motor to Plaintiff had been returned on April 20, 1984 marked insufficient funds. The checks were drawn on the Southern Motor account and bear the stamped signature of Mr. Gersten. The checks were issued on April 18 and 19 in exchange for six vans. The six vans were transferred by Southern Motor to Star Chrysler Plymouth in Tennessee.

On April 27, 1984, Defendant issued six checks to Plaintiff as replacements for the

4. Fed.R.Civ.P. 11.

returned checks. The second set of checks was drawn on the Southern Motor account and signed by Defendant as a corporate officer. These checks were not honored by First American and were returned to Plaintiff marked account closed. Mr. Howle testified that he telephoned Defendant after receiving the second set of returned checks and informed Defendant of his intent to file a law suit.

On May 3, 1984, Plaintiff filed a civil action against Defendant.[5] In addition, Mr. Howle contacted the district attorney and caused a criminal warrant to be issued against Defendant. Defendant was arrested and held for several hours before being released on a $200,000 bond. Defendant was later indicted by a grand jury for issuing bad checks and for theft by taking. Issuing bad checks in the amount of $500 or more and theft by taking are felonies under Georgia law.[6]

The civil action was settled by a consent judgment entered on October 25, 1984. In the judgment, Defendant agreed to pay Plaintiff $98,601.44 principal, $3480 interest, and $6900 attorney's fees. Defendant further agreed that the consent judgment would be considered an agreement under section 524(c) of the Bankruptcy Code,[7] that he would not seek to discharge the judgment under any provision of the Bankruptcy Code, and that the judgment would not be dischargeable in bankruptcy. Defendant testified that he was aware of the contents of the consent judgment and that he was represented by counsel when he signed the consent judgment.

On October 24, 1984, Mr. Howle signed a waiver of prosecution of the criminal charges. An order dismissing the criminal charges was entered on October 25, 1984.

Mr. Alan Alexander, the attorney who represented Defendant in the civil and criminal actions, testified that the consent judgment and dismissal of the criminal charges were negotiated as part of a single plan. Mr. Alexander described the resolution of the two actions as a "package deal." He testified that he did not participate in the drafting of the consent judgment and that he and Defendant had virtually no input regarding the contents of the judgment. Mr. Alexander stated that, although the district attorney was contacted and informed of the compromise being negotiated between the parties, the district attorney did not initiate the dismissal of the criminal charges.

## CONCLUSIONS OF LAW

Plaintiff has conceded that this Court has exclusive jurisdiction regarding the dischargeability of a debt and, therefore, is not bound by the section of the judgment which states that the debt is nondischargeable in bankruptcy. Plaintiff contends, however, that a legally binding contract was created when Defendant agreed to forego his legal right to attempt to discharge the debt. Plaintiff requests that the Court enforce this contract. The Court will first examine the validity of this waiver agreement.

A contractual waiver of the dischargeability of a particular debt should be governed by the requirements of section 524(c) and (d)[8] which control the validity of reaffirmation agreements. *Kingsman v. Levinson (In re Levinson)*, 58 B.R. 831, 837 (Bankr.N.D.Ill.), *aff'd*, 66 B.R. 548 (N.D.Ill.1986); *Alsan Corp. v. DiPierro (In re DiPierro)*, 69 B.R. 279, 282 (Bankr.N.D. Ind.1987). In the consent judgment, Defendant and Plaintiff agreed that the judgment was to be considered an agreement under section 524(c) of the Bankruptcy Code. Subsection (c)(2) of section 524 provides:

5. In the civil action, Plaintiff sought $100,000 in actual damages and $500,000 in exemplary damages.

6. *See* O.C.G.A. § 16-9-20(b)(2) (Supp.1987); O.C.G.A. § 16-8-2 (1984).

7. In his answer to Plaintiff's complaint, Defendant rescinded the section in the consent agreement that states that the agreement shall constitute an agreement under section 524 of the Bankruptcy Code.

8. 11 U.S.C.A. § 524(c), (d) (West 1979 & Supp. 1987).

(c) An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable ... only if—

....

(2) such agreement contains *a clear and conspicuous statement which advises the debtor that the agreement may be rescinded* at any time prior to discharge or within sixty days after such agreement is filed with the court ...;

11 U.S.C.A. § 524(c)(2) (West Supp.1987) (emphasis added). This requirement is clearly not met by the consent judgment, therefore the judgment is unenforceable as a reaffirmation agreement.

■ The Court has determined that section 524 does not prevent the discharge of Plaintiff's claim. Plaintiff, however, contends that a party may agree to forego a legal right, that such an agreement creates a binding contract, and that this Court should enforce the contract. If the Court were to adopt Plaintiff's analysis, then creditors would essentially have the power to nullify the fresh start provided by the Bankruptcy Code. One of the central purposes of the Bankruptcy Code is to give debtors " '... new opportunity in life and clear field for future effort, unhampered by pressure and discouragement of pre-existing debt....' " *Indiana National Bank v. Lones (In re Lones)*, 50 Bankr. 801, 802, 13 Bankr.Ct.Dec. 281, 282, 13 Collier Bankr.Cas.2d 464, 466 (Bankr.W.D. Ky.1985) (quoting *Hanover National Bank v. Moyses*, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902)).[9] Plaintiff's argument is contrary to the spirit of the Bankruptcy Code. The Court concludes, therefore, that the provisions of the consent judgment which pertain to the waiver of Defendant's right to a discharge are void. The Court will, therefore, address the issue of dischargeability under section 523.

Plaintiff contends that the debt underlying the consent judgment was a debt incurred by Defendant for property obtained by false pretenses, false representations, or actual fraud and thus the debt is nondischargeable under section 523(a)(2)(A). Section 523(a)(2)(A) provides:

(a) A discharge under section 727, 1141[,] 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

....

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C.A. § 523(a)(2)(A) (West Supp. 1987).

■ Under the general rule, all debts are dischargeable in bankruptcy unless specifically excepted by the provisions of the Bankruptcy Code. *In re Levinson*, 58 B.R. at 837 & n. 4. Complaints on dischargeability are strictly construed against creditors because exceptions to dischargeability frustrate the fresh start and rehabilitative purposes of the Bankruptcy Code. *In re Lones*, 50 B.R. at 802, 13 Bankr.Ct. Dec. at 282, 13 Collier Bankr.Case.2d at 466. A creditor seeking to have a debt determined to be nondischargeable under section 523 bears the burden of proving each element by clear and convincing evidence. *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir.1986).

"In order to preclude the discharge of a particular debt because of a debtor's false representation, a creditor must prove that: the debtor made a false representation with the purpose and intention of deceiving the creditor; the creditor relied on such representation; his reliance was reasonably founded; and the creditor sustained a loss as a result of the representation. The debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without

---

**9.** The Supreme Court in *Moyses* was referring to the purpose behind the Bankruptcy Act. This purpose was incorporated in the fresh start provisions of the Bankruptcy Code.

the imputation of bad faith or immorality." *In re Hunter* at 1577 (citations and footnote omitted).

In *In re Halpern,* [10] the Eleventh Circuit Court of Appeals affirmed the ruling of the district court and the bankruptcy court when it concluded that the bankruptcy court had properly utilized issue preclusion to reach conclusions regarding the facts underlying a determination of the dischargeability of a debt evidenced by a state court consent judgment. The consent judgment in *In re Halpern* stated that the consent judgment would constitute a final adjudication of the findings of fact. The consent judgment also stated that the judgment would collaterally estop the debtor from denying any of the factual or legal issues established in the judgment and that the debtor received consideration for agreeing to allow the judgment to act as a final adjudication. 810 F.2d at 1064–65. The Eleventh Circuit held that issue preclusion was proper since the consent judgment contained very detailed factual findings and there was no evidence that the debtor had signed the consent judgment under duress or coercion. *Id.* at 1065. The Court of Appeals noted, however, that the consent judgment only had a preclusive effect regarding the findings of fact and that the bankruptcy court must make an independent decision concerning the dischargeability of the debt. *Id.* at 1063–64.

The consent judgment presently before the Court does not contain any findings of fact, nor does the consent judgment provide that it is to have any collateral estoppel effect. The present adversary proceeding is, therefore, distinguishable from *In re Halpern.* Thus, the Court must make independent findings regarding the factual basis underlying the initial incurring of the debt evidenced by the consent judgment.

Section 523(a)(2)(A) lists three ground upon which a debt may be found nondischargeable. All three require an intent to deceive or to perpetrate a deception. *Bank of Griffin v. Floyd (In re Floyd),* Ch. 7 Case No. 81–51071, Adv. No. 81–5247 (Bankr.M.D.Ga. July 20, 1982); *Georgia Bank & Trust Co. v. McKinney (In re McKinney),* 18 B.R. 607 (Bankr.M.D.Ga. 1982). The fraudulent intent necessary to render a debt nondischargeable must exist at the inception of the debt. *Macon Bank & Trust Co. v. Wood (In re Wood),* Civ. Action No. 81–151–Mac (M.D.Ga.1982); *In re Floyd.* Subsequent misrepresentations have no effect upon the dischargeability of a debt, since the false representation could not have been the creditor's reason for the extension of credit. *Barch v. Cokkinias (In re Cokkinias),* 28 B.R. 304, 307, 8 Collier Bankr.Cas.2d 240, 243–44 (Bankr.D. Mass.1983).

The second set of checks issued by Defendant was a replacement for the first set of checks that had been dishonored for insufficient funds. No new debt or obligation was incurred by the issuance of the second set of checks. The second set of checks represents an attempt to pay a previously existing obligation. *See Tate v. Tabers (In re Tabers),* 28 B.R. 679, 681, 9 Collier Bankr.Cas.2d 107, 109–11 (Bankr.W. D.Ky.1983). The issue before the Court, therefore, is whether Defendant acted with fraudulent intent when the first set of checks was issued.

Courts are divided on the question of whether the issuance of a check that is ultimately dishonored for insufficient funds is a false representation.[11] This Court need not address this issue in the present adversary proceeding, however, since Plaintiff has failed to prove by clear and convincing evidence that Defendant had the

---

10. *Halpern v. First Georgia Bank (In re Halpern),* 810 F.2d 1061 (11th Cir.1987). The consent judgment in *In re Halpern* contained a waiver agreement similar to the waiver agreement involved in the present adversary proceeding. The Court of Appeals did not discuss any possible effect that such a waiver agreement might have, thus the decision in *In re Halpern* has no

effect upon this Court's analysis of the waiver agreement presented in this adversary proceeding.

11. *See Western Petroleum Co. v. Burgstaler (In re Burgstaler),* 58 B.R. 508, 512–13 (Bankr.D.Minn. 1986) (discussing the split between the courts).

requisite intent to deceive Plaintiff when the first set of checks was issued.

At the time the first set of checks was issued, Southern Motor was operating on an overextended line of credit. Southern Motor continued to issue checks on its account, even though it knew or should have known that the checks were not supported by sufficient funds. Southern Motor had operated in this manner for several months. First American, although increasingly concerned with the condition of the credit line, continued to allow Southern Motor to operate above its credit limit in a manner similar to overdraft protection. The Court concludes that neither Defendant nor Southern Motor was acting with an intent to deceive creditors. When it issued the first set of checks, Southern Motor was simply relying on its established banking practice with First American. This reliance negates a finding that the checks were issued with an intent to deceive. *See Western Petroleum Co. v. Burgstaler (In re Burgstaler)*, 58 B.R. 508, 514–15 (Bankr.D. Minn.1986); *A.G. Edwards & Sons, Inc. v. Paulk (In re Paulk)*, 25 B.R. 913, 918 (Bankr.M.D.Ga.1982).

Since there was no intent to deceive when the first set of checks was issued, there was no actionable fraud or misrepresentation when the debt was incurred. As noted earlier in this opinion, any subsequent misrepresentations are irrelevant. Thus, the Court concludes that Plaintiff's claim is not nondischargeable under section 523(a)(2)(A). The next issue before the Court is whether Plaintiff's claim is nondischargeable under section 523(a)(2)(B).

■ Subsection (a)(2)(B) provides that a debtor may not discharge a debt for property received by:

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, proper-

ty, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

. . .

11 U.S.C.A. § 523(a)(2)(B) (West Supp. 1987). Under the law of Georgia, a check is a negotiable instrument.[12] A negotiable instrument is an unconditional promise to pay a sum certain. Thus, a check is evidence of a debt, not a statement of one's financial condition. *In re Paulk* at 917.

In *Williams v. United States*, the United States Supreme Court found that a check was not a statement of financial condition. *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982). In *Williams* the Supreme Court stated:

Although petitioner deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." Petitioner's bank checks served only to direct the drawee banks to pay the face amounts to the bearer, while committing petitioner to make good the obligations if the banks dishonored the drafts. Each check did not, in terms, make any representation as to the state of petitioner's bank balance. As defined in the Uniform Commercial Code, a check is simply "a draft drawn on a bank and payable on demand," § 3–104(2)(b), which "contain[s] an unconditional promise or order to pay a sum certain in money," § 3–104(1)(b).

458 U.S. at 284–85, 102 S.Ct. at 3091–92. The decision in *Williams* concerned a defendant's criminal liability for "check kiting" under 18 U.S.C. § 1014.[13] Under section 1014, it is a crime to knowingly make a false statement to influence a loan decision by a federally insured bank. The Supreme Court stated that a check was not a statement within the meaning of section 1014.

■ Although the decision in *Williams* concerned the interpretation of a criminal

---

**12.** O.C.G.A. § 11–3–104 (1982).

**13.** 18 U.S.C.A. § 1014 (West Supp.1987).

statute, the decision of the Supreme Court regarding representations made by the issuance of a check is persuasive reasoning in the context of this bankruptcy case. Thus, relying on the analysis of the Supreme Court in *Williams*, the Court finds no violation of section 523(a)(2)(B) because Defendant never issued a written statement of financial condition. Additionally, for the same reasons discussed in its analysis of section 523(a)(2)(A), the Court finds that Defendant lacked the intent to deceive required by section 523(a)(2)(B)(iv). Thus, Plaintiff's debt is not excepted from discharge under section 523(a)(2).[14]

■ In Count II of its complaint, Plaintiff requests that Defendant be denied a discharge under section 727(a)(2), (3), and (5). Section 727 provides in pertinent part:

(a) The court shall grant the debtor a discharge, unless—

. . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

■

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

11 U.S.C.A. § 727(a)(2), (3) and (5) (West 1979). Under section 727, Plaintiff bears the burden of proving its objections. R.Bankr.P. 4005. The Court finds that Plaintiff has failed to carry its burden.

Plaintiff failed to address its section 727 objections in its brief. The evidence presented at trial shows that Plaintiff sold six converted vans to Southern Motor. Southern Motor paid for the vans with six checks. These checks were later dishonored. The six vans were sold to a dealership in Tennessee. Southern Motor deposited the money from the sale of the vans into its account at First American. The Court can find no evidence to support a finding that the proceeds of the van sales were used for anything outside of the normal course of business of Southern Motor. Thus, Plaintiff has not sustained its burden under section 727(a)(2) or (5).

■ Similarly, the Court can find no evidence to sustain a denial of discharge under section 727(a)(3). The financial records presented at trial appear to be complete. Plaintiff has not asserted that the financial records are falsified or inadequate. The Court will not deny Defendant's discharge based upon Plaintiff's unsupported objection.

■ In his counterclaim, Defendant seeks an award of costs and attorney's fees under section 523(d) of the Bankruptcy Code and Rule 11 of the Federal Rules of Civil Procedure. Defendant's request for

---

**14.** Since the Court has determined that the debt underlying the transaction is a dischargeable debt, the Court need not address the issue of whether Defendant is liable in his individual bankruptcy for the debt of Southern Motor. The Court notes that the Eleventh Circuit Court of Appeals has ruled that a corporate debt may be nondischargeable in the individual bankruptcy of a corporate officer. *See Ford Motor Credit Co. v. Owens*, 807 F.2d 1556 (11th Cir.1987). In *Owens*, however, the underlying debt was nondischargeable. Since the corporate officer was found to have acted in a tortious manner, the Court of Appeals found that the debt was nondischargeable in the officer's individual bankruptcy. Thus, *Owens* is clearly distinguishable from the present adversary proceeding in which the underlying debt is dischargeable.

an award under section 523(d) must be denied. Section 523 applies only to proceedings to determine the dischargeability of a consumer debt. The debt involved in the present adversary proceeding is clearly not a consumer debt as that term is defined by the Bankruptcy Code,[15] therefore section 523(d) is inapplicable.

Rule 11 requires that each pleading be signed by an attorney or a party. The signature certifies that the pleading is well grounded in fact, warranted by existing law, and not imposed for any improper purpose. The purpose of Rule 11 is to discourage dilatory and abusive tactics. Fed.R.Civ.P. 11 advisory committee's note. The Court, having reviewed the file and the evidence, finds that sanctions under Rule 11 are not warranted. Defendant's request for attorney's fees and costs under Rule 11 is denied.

**15.** *See* 11 U.S.C.A. § 101(7) (West 1979).