In re Bruce Robin GUEST, Debtor.

**UNION NATIONAL BANK & TRUST COMPANY OF SOUDERTON,**
Plaintiff

v.

**Bruce Robin GUEST, Defendant.**

**Bankruptcy No. 95–15343SR.**
**Adv. No. 95–0787.**

United States Bankruptcy Court,
E.D. Pennsylvania.

April 1, 1996.

John R. Crayton, McCarthy & Crayton, Bensalem, PA, for debtor.

Wendy G. Rothstein, Pearlstine/Salkin Associates, Lansdale, PA.

Gloria Satriale, Chester Springs, PA, trustee.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

Before the Court is the Complaint filed by Union National Bank & Trust Company of Souderton ("UNB") objecting to the discharge of a debt arising out of a certain check issued by the Debtor, Bruce Robin Guest. UNB alleges that by issuing that check against insufficient funds, the Debtor obtained money by false pretenses, a false representation, or actual fraud which renders the resulting debt nondischargeable under 11 U.S.C. § 523(a)(2).

An evidentiary hearing was held on February 12, 1996, and the parties have submitted Memoranda of Law in support of their respective positions. For the reasons which follow, the Court has determined that UNB's objection must be denied.

### Background

The essential facts are not in dispute. The Debtor was the president of a now defunct corporation, Allied Drywall and Plastering, Inc. ("Allied"), that performed union carpentry and drywall subcontracting in Pennsylvania, New Jersey and Delaware.

On July 31, 1990, the Debtor opened a payroll checking account at UNB on behalf of Allied. At that same time, the Debtor executed a Depositor's Account Contract which provided that Allied would receive provisional credit for any checks which were deposited into the account and that UNB had the right to reverse that provisional credit, if any checks were deposited in the account and subsequently returned for insufficient funds. Allied also maintained a checking account at Germantown Savings Bank ("GSB").

Allied was experiencing serious financial problems in the summer and fall of 1990. Apparently, in order to maintain operations and to satisfy Allied's financial obligations, particularly payroll, in as timely a manner as possible, the Debtor routinely authorized and signed checks drawn on Allied's checking accounts, which exceeded the balance available in those accounts. The Debtor's established practice was to issue checks against the anticipated collections of accounts receivable. Typically, the Debtor deposited collected accounts receivable payments within one day to cover the checks which were drawn against Allied's checking accounts.

On November 7, 1990, the Debtor issued a check in the amount of $30,000, which was drawn on Allied's GSB account, and deposited into the UNB account. On November 8, 1990, the Debtor issued a check in the amount of $50,000, which was also drawn on Allied's GSB account, and deposited into the UNB account. UNB provided provisional credit for both checks which increased the balance in Allied's account by $80,000. The Debtor immediately issued a number of checks against the $80,000 provisional credit to satisfy its November 9, 1990 payroll, as well as other outstanding obligations. The Debtor explained that if his union employees had not received their payroll checks on November 9, 1990, they would have "shut the jobs down."

On November 9, 1990, the Internal Revenue Service ("IRS") served a Notice of Levy upon several of the general contractors from whom the Debtor anticipated collecting payment of accounts receivable that same day. As a result, the Debtor was unable to collect the anticipated amount of accounts receivable and deposit those collections in the GSB account to cover the $30,000 and $50,000 checks deposited at UNB.

Over the period of the next few weeks, Allied did not deposit sufficient moneys in its GSB checking account to cover the $30,000 and $50,000 checks drawn against the account and deposited at UNB. UNB presented the $30,000 and $50,000 checks to GSB for payment through the Federal Reserve System. Both checks were returned to UNB unpaid and stamped NSF, i.e., nonsufficient funds. UNB presented the checks a second time for payment, and, once again, GSB returned the checks to UNB unpaid with an explanation that Allied's checking account at GSB was closed.

During this same time period, Allied did continue operations. In fact, the Debtor deposited approximately $105,000 in the UNB checking account during the period of November 9, 1990 through December 10, 1990. However, the Debtor continued to issue checks drawn on Allied's UNB account. Thus, when the $30,000 and $50,000 checks were returned unpaid by GSB for the second time, UNB was unable to recoup the full amount of the provisional credit extended to Allied. On December 10, 1990, UNB issued a debit memo reversing the $50,000 provisional credit to Allied's checking account which resulted in a negative balance in the UNB account of $45,580.76. UNB setoff against another Allied account and reduced its loss to $40,875.72. This loss is the underlying basis of the debt which UNB now seeks to be declared nondischargeable.

Allied filed a petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, on December 20, 1990. That same day, Allied obtained a Release of Levy from the IRS. Allied's Chapter 11 case was eventually converted to a case under Chapter 7. UNB apparently did not receive a distribution from Allied's Chapter 7 estate.

In 1992, UNB filed a criminal complaint against the Debtor alleging various violations of the Pennsylvania Crime Code relating to the $50,000 bad check. The Debtor was charged with violating 18 Pa.C.S.A. § 4105, and subsequently pled guilty to a misdemeanor bad check charge. Under the terms of a negotiated plea bargain agreement, the Debtor was required to make restitution in the amount of $12,000 to UNB, and to sign a judgment note in the amount of $28,948.37 in favor of UNB.

After completing the required restitution payment, the Debtor remained indebted to UNB for the full amount of the judgment note. On July 12, 1995, the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code. UNB filed the instant complaint under 11 U.S.C. § 523(a)(2)(A) and (B) objecting to the discharge of the remaining debt.

**Discussion**

■ The Court notes preliminarily that exceptions to discharge are to be construed strictly against the creditor and in favor of the debtor to preserve the debtor's "fresh start." *Matter of Scarlata,* 979 F.2d 521 (7th Cir.1992); *In re Chryst,* 177 B.R. 486, 492 (Bankr.E.D.Pa.1994). A creditor challenging the discharge of a particular debt under section 523(a)(2) must prove that the debt should not be discharged by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Whether a debt is nondischargeable pursuant to 11 U.S.C. § 523 is a matter of federal law. *Brown v. Felsen,* 442 U.S. 127, 129–30, 99 S.Ct. 2205, 2208–09, 60 L.Ed.2d 767 (1979)

### Section 523(a)(2)(A)

■ Section 523(a)(2)(A) of the Bankruptcy Code directs that a debtor should not be discharged from any debt obtained by false pretenses, a false representation, or actual fraud other than statements regarding the debtor's or an insider's financial condition, which are governed by § 523(a)(2)(B).[1] To succeed on its claim that the debt is not dischargeable, UNB must prove the following elements by a preponderance of the evidence:

(1) that the debtor obtained money, property or services through a material misrepresentation;

(2) that the debtor, at the time, knew was false;

(3) that the debtor intended to deceive the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained the alleged loss and damages as a proximate result of the debtor's material false misrepresentation.

---

1. Section 523(a)(2)(A) provides:
 (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—. . .
 (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

 (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

 11 U.S.C. § 523(a)(2)(A).

*In re Edwards,* 143 B.R. 51 (Bankr.W.D.Pa. 1992); *see also, In re Van Horne,* 823 F.2d 1285, 1287 (8th Cir.1987); *In re McDonald,* 177 B.R. 212, 215 (Bankr.E.D.Pa.1994). Against the foregoing legal principles, the Court turns to the dispute presently before the Court.

## Material Misrepresentation

■ UNB claims that by issuing a $50,000 check drawn on Allied's GSB account, the Debtor made a representation that funds were available in that account when the Debtor knew that there were not sufficient funds available to cover the check. Courts are split on the question of whether tendering a check written against insufficient funds constitutes a "false representation" under § 523(a)(2)(A). One lines of cases adopts a *per se* rule that issuing a check written against insufficient funds is fraudulent for purposes of § 523(a)(2). *See, e.g., In re Stacey,* 105 B.R. 672 (Bankr.S.D.Ala.1989). That line of cases, however, ignores the Supreme Court's decision in *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982). In that case, the Supreme Court held that knowingly passing a bad check does not constitute a "false statement" within the meaning of a statute that makes it a crime to make a false statement to a banking institution. *Williams,* 458 U.S. at 284, 102 S.Ct. at 3091. In reaching its decision, the Supreme Court analyzed the nature of a check and stated that:

> [The issuing of the check] did not involve the making of a "false statement," for a simple reason: a check is not a factual statement at all and therefore cannot be characterized as "true" or "false." Petitioner's bank checks served only to direct the drawee banks to pay the face amounts to the bearer, while committing the petitioner to make good the obligations if the bank dishonored the drafts. *Each check did not, in terms, make any representation as to the state of petitioner's bank balance.*

*Williams,* 458 U.S. at 284–85, 102 S.Ct. at 3091 (emphasis added).

While the decision in *Williams* concerns a criminal statute, the Supreme Court's rationale is equally applicable within the bankruptcy context. *See Stewart v. East Ten-*

*nessee Title Insurance Agency, Inc. (In re Union Security Mortgage Co.),* 25 F.3d 338 (6th Cir.1994). In *Union Security Mortgage Company,* which dealt with the Chapter 11 trustee's attempt to avoid an alleged preference, the Sixth Circuit reversed the District Court's finding that the debtor's delivery of a check, which was later returned for insufficient funds, was fraudulent. The District Court, relying upon Tennessee state law that premised a cause of action in fraud on a material misrepresentation, determined that the debtor's delivery of a dishonored check was clearly fraudulent as that delivery misrepresented to the creditor that the debtor had sufficient funds in its bank account to cover the amount of the check. In reversing the District Court's decision, the Sixth Circuit looked to the federal law as articulated in *Williams* and stated that "since a check does not make any representation, it cannot make any *mis*representation." *Union Security Mortgage Co.,* 25 F.3d at 341 (emphasis in original).

Seeing no reason why the rationale of *Williams* is inapplicable in the bankruptcy context, the Court is inclined to adopt the reasoning of the second line of cases which follow *Williams* and utilize a more flexible approach in determining whether a debt arising from a dishonored check is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Under that approach, the issuance of a check upon insufficient funds is not, standing alone, a fraudulent misrepresentation sufficient to sustain a nondischargeable claim under § 523(a)(2)(A). *In re Bryson,* 187 B.R. 939 (Bankr.N.D.Ill.1995); *Matter of Gross,* 175 B.R. 277 (Bankr.N.D.Ind.1994); *In re Edwards,* 143 B.R. at 53; *In re Ritzer,* 105 B.R. 424 (Bankr.N.D.Ohio 1989); *Matter of Ethridge,* 80 B.R. 581 (Bankr.M.D.Ga.1987); *In re Burgstaler,* 58 B.R. 508 (Bankr.D.Minn. 1986). The creditor must also establish that the debtor made a representation that there were sufficient funds available to cover the dishonored check. *In re Metcalf,* 30 F.3d 134 (6th Cir.1994); *In re Edwards,* 143 B.R. at 55; *In re Ritzer,* 105 B.R. at 428 (citing cases).

There is no evidence that the Debtor made any representation to UNB that the $50,000

check was backed by sufficient funds. In the absence of any evidence to that effect, the Court concludes that UNB has failed to satisfy its burden of proof that the Debtor made a material misrepresentation.

**Intent to Deceive**

 The crux of the parties' dispute as developed at the hearing was whether or not the Debtor intended to deceive UNB. The Court recognizes, moreover, that from UNB's perspective the Debtor's misrepresentation and intent to deceive are not entirely distinct issues. In other words, UNB's position is essentially that proof of the Debtor's fraudulent intent, along with the fact that the Debtor's corporation undeniably received money through the dishonored check,[2] would be sufficient proof to support a determination that the Debtor obtained money by false pretenses, a false representation, or actual fraud under 11 U.S.C. § 523(a)(2)(A). In that regard, UNB makes two arguments.

 In the first instance, UNB relies on the fact that the Debtor was charged with violating 18 Pa.C.S.A. § 4105 of the Pennsylvania Crimes Code and that he pled guilty to that violation. In reviewing that section of the Crimes Code, UNB argues there is a requirement that there be intent on the part of the person to pass bad checks. UNB argues therefore that by pleading guilty to a violation of § 4105, the Debtor admitted that he in fact intended to pass bad checks.

It is well established, however, that the Debtor need not have intended to defraud UNB to be guilty of a violation under 18 Pa.C.S.A. § 4105. The passing of a check for which there are insufficient funds, where the insufficiency is within the knowledge of the issuer, is a violation of § 4105 regardless of whether the issuer possessed a specific intent to defraud. *Commonwealth of Pennsylvania v. Kyslinger,* 506 Pa. 132, 484 A.2d 389 (1984), citing *Commonwealth v. Mutnik,* 486 Pa. 428, 406 A.2d 516 (1979); *Commonwealth v. Frank,* 322 Pa.Super. 6, 468 A.2d 1131 (1983). Accordingly, by establishing that the Debtor pled guilty to a violation of § 4105,

UNB has not sustained its burden of proof that the Debtor intended to, and in fact did, deceive UNB.

 UNB argues, in the second instance, that by authorizing and signing the $30,000 and $50,000 checks against an account containing insufficient funds, and by failing to make deposits to cover those checks, the Debtor intended to obtain money through false pretenses. In particular, UNB argues that when the Debtor became aware that the IRS had served a notice of levy upon several of the general contractors from whom he anticipated collecting payment of accounts receivable on November 9, 1990, the Debtor must have realized that he would not be able to collect sufficient funds to cover the $30,000 and $50,000 checks drawn on the GSB account. According to UNB, the Debtor's failure to take any action to prevent the UNB's loss evidences his intent to obtain money through false pretenses.

The law is clear, however, that UNB's burden is to establish the Debtor's fraudulent intent at the time he issued the $50,000 check. *Matter of Gross,* 175 B.R. at 285; *see also, In re Guy,* 101 B.R. 961, 979 (Bankr. N.D.Ind.1988); *In re Todd,* 34 B.R. 633, 635 (Bankr.W.D.Ky.1983); *In re Kelsey,* 9 B.R. 154, 157 (Bankr.W.D.Ky.1981). In that regard, UNB did not produce any evidence at the hearing which would support a factual determination that the Debtor intended to deceive UNB when he wrote the $50,000 check on November 8, 1990. To the contrary, the record shows that the Debtor's established practice had been to authorize and sign checks against insufficient funds which historically he had covered by making deposits before the checks were presented to the drawee bank for payment. Accordingly, UNB has failed to establish the Debtor's intent to deceive.

Even if the Court determined that the Debtor's actions after November 8, 1990, were relevant to the inquiry, those actions do

---

**2.** The Court notes that the Debtor argues that a corporate officer who signs a bad check cannot be denied a discharge of individual liability for that bad check. While the Debtor is correct that corporate officers are generally not liable for the debts of their corporation, "they are liable to the extent that their participation in the commission of a tortious act results in some harm to a third party and causes them to be liable to [that] third party." *Ford Motor Credit Co. v. Owens,* 807 F.2d 1556, 1559 (6th Cir.1987).

not support a factual determination that the Debtor intended to obtain money through false pretenses. As noted, UNB points to the Debtor's failure to prevent the loss sustained by the Bank, after learning that Allied's receivables had been attached. In particular, UNB argues the Debtor could have prevented its loss by: (1) immediately notifying UNB of his inability to collect the anticipated accounts receivable and cover the GSB checks on November 9, 1990, so that UNB could have stopped payment on the checks written on the account; or (2) stopped writing checks against the UNB account and depositing a larger portion of Allied's subsequent deposits in the GSB account rather than the UNB account.

The Debtor, in turn, explained that upon learning that the IRS had served levies upon general contractors which owed payments to Allied, and for whom Allied continued to perform subcontracting work, he focused his attentions towards obtaining releases of the levies from the IRS and trying to maintain Allied's operations. The Debtor's actions were simply the actions of an individual whose failing business suffered another setback when the IRS served the Notices of Levy. The subsequent acts of the Debtor in depositing moneys into the UNB checking account, rather than covering the checks written against the GSB account, and his actions of writing additional checks against the UNB account in order to maintain Allied's operations, appear to represent nothing more than an individual trying to save his business.

Having determined that UNB failed to establish that the Debtor made a material misrepresentation, and also that UNB failed establish the Debtor's intent to deceive, the Court concludes that UNB failed to sustain its burden of proof that the debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A). The remaining issue before the Court is whether UNB's claim is nondischargeable under § 523(a)(2)(B).

### Section 523(a)(2)(B)

Section 523(a)(2)(B) provides that a debtor may not discharge a debt for money obtained by:

(B) use of a statement in writing—
 (i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money reasonably relied; and

(iv) that the debtor caused to be made or published with the intent to deceive.

UNB contends that the dishonored $50,000 check is a false statement in writing that there were sufficient funds in the account to cover the check. However, as discussed, a check does not make any representation as to the state of the drawer's bank balance. *Williams,* 458 U.S. at 284–85, 102 S.Ct. at 3091. Additionally, for reasons already discussed, UNB failed to establish that the Debtor had the intent to deceive as required by § 523(a)(2)(B)(iv). The Court concludes therefore that UNB failed to sustain its burden of proof that the debt is nondischargeable under 11 U.S.C. § 523(a)(2)(B). Accordingly, the debt owed by the Debtor to UNB in the amount of $28,875.72 is hereby determined to be dischargeable.