In re Dennis J. FITZGERALD, Debtor.

**KLINE'S SERVICE CENTER, INC., Plaintiff,**

v.

**Dennis J. FITZGERALD, Defendant.**

**Bankruptcy No. 88–61533.
Adv. No. 88–6200.**

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

Dec. 18, 1989.

David Kerr, Valparaiso, Ind., for debtor.

Jerry Shapiro, Munster, Ind., for plaintiff.

1. This Order constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT[1]

KENT LINDQUIST, Chief Judge.

### I

#### Statement of Proceedings

This adversary proceeding came on for bench trial on December 6, 1989 pursuant to pretrial order of the Court on October 26, 1989.

The Plaintiff's complaint alleges that a certain indebtedness to it by the Defendant arising out of an "NSF" check dated June 30, 1988 in the sum of $3,459.28 is nondischargeable pursuant to § 523(a)(2)(A) in that the Defendant fraudulently obtained possession of a certain motor vehicle from the Plaintiff by fraudulently tendering to the Plaintiff said check in consideration for the release of the vehicle repaired by Plaintiff at Defendant's request when there were insufficient funds in the account, and then stopped payment thereon.

### II

#### Findings of Fact

The parties stipulated that Plaintiff's Group Exhibit No. 1 was admissible into evidence without extrinsic evidence and was so admitted.

Plaintiff's Group Exhibit No. 1 was composed of three monthly bank statements of an entity known as Semper Enterprises, Inc. (hereinafter: "Semper") for the months of June, July, and August of 1988.

The Plaintiff's initial witness was Edward L. Kline. He testified as follows:

1. That he was the manager and vice president of the Plaintiff, which was in the business of repairing motor vehicles.

2. That the Defendant brought the vehicle in question into the Plaintiff's shop for repairs.

3. That he was aware that the Plaintiff had the proceeds of an insurance claim versus a third-party's carrier to

Civ.P. 52 as made applicable by Bankruptcy Rule 7052.

pay for the same; that he had received approval prior to doing the repairs from the insurance adjuster as to the nature and amount of the repairs.

4. That the Plaintiff did in fact repair the vehicle, and on June 30, 1988, the Defendant wrote the Plaintiff check no. 127 drawn on the account of Semper Enterprises, Inc. in the sum of $3,459.28.

5. That in consideration for the check the Plaintiff released the vehicle to the Defendant.

6. That said check was deposited by the Plaintiff within one week of delivery and returned because payment had been stopped.

7. That prior to said check being returned by the Bank for stopped payment, the Defendant had called the Plaintiff and advised that he was going to stop payment on the check as there were not sufficient funds in the account to cover the check because of financial difficulties arising out of marital problems; that he would rectify the situation within two weeks, but never did, and the Plaintiff was never paid for the repairs.

8. That the Defendant had inspected the vehicle before delivery without complaint, and all necessary repairs had been made;

9. That the Plaintiff's policy is not to release a repaired vehicle until payment is made; that when there is insurance coverage the Plaintiff will take the insurance check, but the Plaintiff also takes personal checks; that he had been told by the Defendant previously that the Defendant had received the insurance check and had placed the same in his own account prior to the issuance of the personal check.

The Plaintiff's second witness was the Defendant. He testified as follows:

1. That he was the sole owner of Semper Enterprises, Inc. (hereinafter: "Semper"), a mortgage referral business. That Semper was a corporation wholly owned by him, and he was the sole signatory on the Semper account.

2. That he identified Plaintiff's Group Exhibit No. 3 which was admitted into evidence. These were the deposit slips and cancelled checks of Semper covering the period of June 1, 1988 through July 31, 1988.

3. That he personally wrote all checks on the Semper account for the period of June 1, 1988 through July 31, 1988, and made all deposits to the account; that he had no personal checking account.

4. That when he wrote the check in issue on June 30, 1988, he believed there was sufficient funds in the Semper account to cover the same.

5. That he deposited the insurance check in the sum of $3,200.00 in the Semper account on June 2, 1988 (Plaintiff's Group Exhibit No. 1, 6/1/88 to 6/30/88 bank statement); that on or about that time he called the Plaintiff and asked if the Plaintiff wanted the check; that he was advised by the Plaintiff to deposit the check until the vehicle had been repaired.

6. That when he wrote the check to the Plaintiff he did not have enough monies to cover the check; that he did not keep a check register for the account or a running balance in that there were so few transactions in the account he felt no need to keep a check register or to balance or reconcile the account, and had a basic understanding of the balance without any written records; that he had been out of town during the period between the receipt of the insurance check and the issuance of the check to the Plaintiff, and at least three checks, nos. 124, 125 and 126 dated June 22, 1988 to a Child Care Center for $75.00, to a Faye Fitzgerald for $350.00 on June 27, 1988, and $100.00 for cash on June 27, 1988, may have been left with

his wife and issued by him without his knowledge.

7. That the balance in the Semper account was $701.00 when he issued the Plaintiff the check on June 30, 1988, and on July 1, 1988 he withdrew $685.00 from the account for his own personal use.

8. That on the Monday following June 30, 1989 (this would be July 4, 1988), he called the Plaintiff and advised it that he had stopped payment as he had discovered there were insufficient funds in the Semper account to cover the check. It appears per the Bank statement of 7/1/88 to 7/30/88 that the check was stopped on July 5, 1988.

9. That he had no complaints of any significance with the repair work done by the Plaintiff.

10. That the Semper account had no returned items debited to it that were credited to it during May, June or July 1988, which would have created an overdraft.

The Semper account shows a balance at the end of May, 1988 of $7.32. In June of 1988, there was $4,223.04 credited to the account (including the $3,200.00 insurance check) and $3,529.30 in debits.

## III

### Conclusions of Law and Discussion

This Court in the case of *In re Kimberling*, Case No. 85–60801 (*Peoples Federal Savings & Loan Association v. Kimberling*, Adversary Proceeding No. 85–6079) (J. Lindquist, unpub. opin. Jan. 4, 1989) had occasion to examine in detail the applicable law under § 523(a)(2)(A). There this Court stated as follows:

At the outset the Court would note some basic legal principles that apply to adversary proceedings instituted by a creditor to have a debt determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

In keeping with the purpose of the Bankruptcy Code, exceptions to the general rule of dischargeability of debts are to be strictly construed in favor of the Debtor.... The exceptions to dischargeability must be narrowly construed against the creditor's objections, and confined to those plainly expressed in the Code.... This is done to effectuate the fresh start policies of the Bankruptcy Code....

Although, the nondischargeability provision of the Bankruptcy Code has no provisions allocating the burden of proof brought under it, the creditor must establish that the debt is nondischargeable and has the burden on each element.... The creditor objecting to discharge of a debt in bankruptcy bears a heavy burden of proof to establish that the debt is squarely within the statutory exceptions.... The party objecting on the ground of fraud must establish each element of the claim by clear and convincing evidence....

\*       \*       \*       \*       \*       \*

[t]he question of whether a debt is dischargeable is one of federal law....

11 U.S.C. § 523(a)(2)(A) provides as follows:

§ 523. Exceptions to discharge.

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt— ...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

The basic elements of the Plaintiff's claim which must be proved by clear and convincing evidence pursuant to 11 U.S.C. § 523(a)(2)(A) are as follows:

1. That the debtor obtained the money (property or services) through representations which the debtor either knew to be false or made with such reckless disregard for the truth as constitutes a willful misrepresentation;

2. That the debtor possessed scienter, i.e. an intent to deceive; and

3. That the creditor relied on the false representation and the reliance was reasonable.

*In re Kimzey*, 761 F.2d 421, 423 [7th Cir.1985] *supra*.

As to the scienter element, an intent to deceive may logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan (or otherwise part with property or services)....

Because direct proof of reliance is difficult, actual reliance may be proven by circumstantial evidence of reliance....

The actual reliance must be reasonable. The Seventh Circuit has held that the reliance test is not meant to "second guess a creditor's decisions to make a loan or set loan policy for a creditor".... In addition, the Court is not empowered to "undertake a subjective evaluation and judgment of a creditor's lending policies and practices"....

It is important to note the legislative history to 11 U.S.C. § 523(a)(2)(A).

\*        \*        \*        \*        \*        \*

The relevant legislative statements are as follows:

[t]hus, under section 523(a)(2)(A) a creditor must prove that the debt was obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insiders financial condition. Subparagraph (A) is intended to codify current case law e.g., *Neal v. Clark*, 95 U.S. 704 [24 L.Ed. 586] (1887), which interprets "fraud" to mean actual or positive fraud rather than fraud implied in law. Subparagraph (A) is mutually exclusive from subparagraph (B). Subparagraph (B) pertains to the so-called false financial statement.... 124 Cong.Rec. H11095–96 (Daily Ed. Sept. 28, 1978); S17412 (Daily Ed. Oct. 6, 1978). *Reprinted* in 4 *Norton Bankruptcy Law and Practice*, Annotated Legislative History, § 523, page 397 (Callaghan and Company, 1983).

In Indiana, the claimant can prevail when he can prove that the fraud is either actual or constructive. Under Indiana law "constructive fraud" is fraud that arises by operation of law from conduct, which if sanctioned by law, would secure an unconscionable advantage....

However, in an adversary proceeding under § 523(a)(2)(A), there must be proof of positive fraud, and this involves showing that the acts which constitute fraud involved moral turpitude or an intentional wrong; and fraud implied in law which does not require a showing of bad faith or immorality is insufficient.... Therefore, a mere breach of contract by the debtor without more, does not imply existence of actual fraud for purposes of the exception to discharge under Section (a)(2)(A).... A mere promise to be executed in the future, is not sufficient to make a debt non-dischargeable, even though there is no excuse for the subsequent breach.... Thus, it has been correctly held that, by itself, a mere failure to fulfill a promise to pay for goods on credit is not fraudulent, so as to render a debt nondischargeable.... However, when a debtor purchases goods on credit knowing he does not intend to pay for the goods, or knowing he is unable to comply with the requirements of the contract, the debt may be nondischargeable.... If a debtor enters into a contract intending not to comply with its terms, and later defaults under that contract, such contract may provide a basis for exceptions to discharge on the grounds of fraud *if the other remaining elements are satisfied*....

While as a general proposition the alleged fraud must exist at the inception of the debt, and statements or actions which were neither false nor fraudulent when made will not be made so by the happening of subsequent events, a promisors subsequent conduct may reflect his state of mind at the time he made the promise, and thus be considered in determining whether he possessed the requisite fraudulent intent.... Thus, a debtor's subsequent partial payment miti-

gates the inference of necessary intent to defraud.... Nevertheless, false representations or false statement encompass statements that falsely purport to depict current or past facts and do not relate to future action....

Actual "fraud" precluding discharge consists of any deceit, artifice, trick or design, involving the direct and active operations of the mind used to circumvent or cheat another; something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.... However, fraud may consist of silence, concealment or intentional nondisclosure of a material fact, as well as affirmative misrepresentation of a material fact....

A "false pretense" involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a "false representation" which is an express misrepresentation....

The finding of fact as to whether or not the defendant had a fraudulent intention or scienter will obviously have to be determined by circumstantial evidence in most cases as direct evidence of the defendant's state of mind at the time of the credit extension or the transfer of property or services for a check on a cash transaction is seldom expressly indicated. Although this is certainly a difficult task, it is no greater task than any other cause of action that includes intent or state of mind as a necessary element. And the existence of fraud may be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates he intended to deceive or cheat the creditor.... The Court may logically infer this intent not to pay from the relevant facts surrounding each particular case.... And a persons intent, his state of mind, has been long recognized as capable of ascertainment and a statement of present intention is deemed a statement of a material existing fact sufficient to support a fraud action....

To except a debt for property, services or credit from discharge, the property, services or credit must have actually been obtained by the debtor from the creditor as a direct result of the fraud. Expressed another way, a creditor must have given present consideration based on the false pretense, false representation or actual fraud. Thus, a debt which is otherwise dischargeable does not become nondischargeable on the grounds of fraud because the debtor attempted to pay by a check that was subsequently dishonored where the creditor sustains no loss by reason of the issuance of the check, and the debtor obtained no money, property or thing by reason of the issuance of the check....

11 U.S.C. § 523(a)(2)(A) gives no special treatment to checks issued against insufficient funds, and in applying general principles of fraud as set out above to bad check cases, the courts have held that the issuance of a check upon insufficient funds is not *per se* probative of a fraudulent intent to deceive sufficient to give rise to constitute a nondischargeable debt on the ground of fraud.... The issuance of an "NSF" check is thus not conclusive evidence of intent to defraud, but must be considered in light of all the facts and circumstances....

The Court in *In re Jenkins*, 61 B.R. 30 (Bankr.D.N.D.1986) in discussing the issuance of checks returned for insufficient funds and § 523(a)(2)(A) stated as follows:

The United States Supreme Court, in *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), determined that an insufficient funds check does not make any representations as to the state of an issuer's bank balance:

Although petitioner deposited several checks that were not supported by sufficient funds, the course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." Petitioner's bank checks—served only to direct the drawee banks to pay the face amounts to the bearer,

while committing petitioner to make good the obligations if the banks dishonored the drafts. Each check did not, in terms, make any representation as to the state of the petitioner's bank balance.

*Williams,* 458 U.S. at 284–85, 102 S.Ct. at 3091–92. Although *Williams* was a criminal case, the elements necessary to establish the crime were very similar to the elements of a section 523 action in that the government had to establish that the defendant (issuer) made a false statement for the purpose of influencing a financial institution upon any application, advance, commitment, or loan. *Id.* at 284, 102 S.Ct. at 3091.

*Id.* at 39–40.

*Williams v. United States* involved an application of 18 U.S.C. § 1014 which prohibits the making of a "false statement or report" for the purposes of influencing actions or decisions by a federally insured bank. The defendant in *Williams* had engaged in a "check-kiting" scheme by which he obtained the interest fee use of funds by depositing N.S.F. checks and then reissuing other ones, using several accounts in a circular fashion.

The United States Supreme Court in *Williams* also noted as follows:

As defined in the Uniform Commercial Code, a check is simply "a draft drawn on a bank and payable on demand" § 3–104(2)(b), which "contain[s] an unconditional promise or order to pay a sum certain in money," § 3–104(1)(b). As such, "[t]he drawer engages that upon dishonor of the draft and any necessary notice of dishonor or protest he will pay the amount of the draft to the holder." § 3–413(2).

*Williams,* 458 U.S. at 284–285, 102 S.Ct. at 3091–3092.

Indiana has adopted Article 3 of the Uniform Commercial Code.

\*　　\*　　\*　　\*　　\*　　\*

Finally, it is clear under the Uniform Commercial Code that a check is not an assignment of funds. Indiana Code 26–1–3–409(1) states as follows:

Sec. 409. (1) A check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it.

The Indiana Courts have not interpreted the above provisions, but courts in other jurisdictions having like statutes have uniformly held that a check is not an assignment of funds.

\*　　\*　　\*　　\*　　\*　　\*

Indiana Code 26–1–4–401 provides that if a Bank pays an overdraft it may charge that customer who caused the overdraft with liability therefore. This simply means that the Bank is permitted to enforce the debt created by the overdraft in the same manner as a loan or promissory note....

It has also been held that the mere issuance of an insufficient funds check, even with knowledge of the insufficiency of funds on deposit, does not give rise to nondischargeable liability where the debtor made no statements regarding the sufficiency of funds on deposit, or any other misrepresentation in connection with the issuance of the check as an insufficient funds check does not make any representation as to the state of the issuer's bank balance....

It has also been consistently held that the issuance of a check does not constitute a statement of financial condition for the purposes of establishing false pretense by the debtor in warranting solvency so as to include discharge of a debt....

Even the issuance of a check in reckless disregard of the balance in an account, but without an intent to deceive is not enough to constitute fraud under § 523(a)(2)(A)....

Based on the foregoing line of cases this Court rejects the approach that the issuance of an insufficient funds check is *per se* probative evidence of an intent to deceive pursuant to 11 U.S.C. § 523(a)(2)(A), and thus it is incumbent

on the Plaintiff to show by clear and convincing evidence that the Defendant committed separate and distinct fraud in conjunction with the issuance of the check before the debt created thereby can be held nondischargeable.

Accordingly, where a debtor issues checks and makes concurrent false representations that the bank account contained sufficient funds to cover the checks, or other fraudulent statements in conjunction with the issuance of an N.S.F. check, the debt may be nondischargeable; . . . . Thus, a misrepresentation with intent to defraud in connection with the issuance of an N.S.F. check may constitute fraud. . . .

A debt arising from the issuance of an N.S.F. check may also be held to be nondischargeable if it is shown not only that the drawer knew the check to be backed by insufficient funds, but that he also clearly intended to actually defraud the payee based on the facts and circumstances. . . .

\*    \*    \*    \*    \*    \*

The Court may not rely on the Indiana Criminal Code, 35–43–4–4(e) in resolving this matter which states:

[A] person who has insufficient funds in or on account with a drawee credit institution, and who makes, draws, or utters a check, draft or order for payment on the credit institution may be inferred:

(1) to have knowledge that the credit institution would refuse payment upon presentment in the usual course of business; and

(2) to have intended to deprive the owner of any property acquired by making, drawing, or uttering the check, draft or order for payment of a part of the value of that property.

As noted previously, whether a debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) is a matter of federal law, not the law of the state where the check was issued. . . . Also, the burden is on the Plaintiff to show by clear and convincing evidence that the Defendant acted fraudulently. . . . Finally, a debt may

not be held nondischargeable based upon fraud implied in law. . . .

Therefore, the Court cannot indulge in any presumption versus the Defendant pursuant to Indiana Code 35–43–4–4(e). The Court further finds that this state-created presumption is not applicable pursuant to Fed.R.Evid. 302, inasmuch as state law does not supply the rule of the decision in determining this proceeding, and federal substantive law pursuant to § 523(a)(2)(A) is dispositive of the Defendant's liability. . . . The burden of proof in nondischargeability cases is a federal question governed by federal law; . . .

*Id.* at pp. 16–32 (Citations omitted).

█ While it is clear that the issuance of an NSF check is not *per se*, sufficient to hold a debt represented thereby as nondischargeable under § 523(a)(2)(A) for fraud—particularly since the plaintiff has the burden of proving actual fraudulent intent by clear and convincing evidence,—scienter may be found, and in fact in most cases can only be found by, circumstantial rather than by direct evidence.

█ If from the surrounding facts and circumstances the Court can reasonably conclude that the Defendant had no intention of permitting the check to clear at the time he issued the same to the Plaintiff in exchange for the delivery of the vehicle then fraud can be found. Although subsequent fraudulent conduct cannot support a finding of nondischargeability based on fraud if there was no fraudulent intent at the time the check was delivered in exchange for the vehicle in that the Plaintiff must be damaged by fraud by reliance thereon, at the time of the transfer of the consideration, subsequent conduct may be considered to determine the Defendant's actual state of mind at the time the check was issued.

█ Here, the Defendant professes that when he wrote the check he thought there were sufficient funds in the account. This is not credible. The Defendant himself stated that there were so few transactions in the account that he was basically aware

of the approximate balance therein without any written records. Yet, the balance when the check was written on June 30, 1988 was only $701.06. The insurance check of $3,200.00 was deposited on June 2, 1988 leaving a balance on that date of $3,207.32. Thirteen other checks were subsequently written by the Defendant between June 3, 1988, and June 29, 1988 totaling $3,527.00, while only three other deposits were made from June 4, 1989 through June 20, 1989 totaling $1,023.04.

On July 1, 1989 on the day after the check in question was issued to the Plaintiff, the Defendant wrote a check to himself for $685.00 leaving a balance of $16.06 in the account.

The Defendant advised the Plaintiff around June 2, 1988 that he had the insurance check and was told by the Plaintiff to deposit those funds in his own account and draw a personal check on the same when the vehicle repairs were completed. Although, clearly the Defendant did not legally hold these funds either in express or constructive trust for the Plaintiff, and title to these funds were in the Defendant, the Plaintiff relied on the Defendant to retain an amount of collected funds in his account at least equivalent to the insurance check, on which could be drawn upon by the Defendant via a check to the Plaintiff in exchange for the vehicle. Having had an opportunity to examine the record and the other transactions surrounding the issuance of the check, and to observe the witnesses does not find the testimony of the Defendant to be reliable and credible. The Court concludes that based on surrounding facts and circumstances, the Defendant had no intention of paying for the repairs when he received the vehicle, and that he knew full well he did not have sufficient funds in the account when he wrote the check in exchange for the vehicle. Based upon his own testimony that there were not a sufficient number of transactions in the account to keep a check register, and that he could basically keep track of the account and its balance, the Defendant's testimony that he did not know whether there were sufficient funds in the account is not credible. In addition, even if his testimony that he may have forgotten that his wife may have issued checks No. 124, 125 and 126 which had he written and left with her were to be believed, they only totaled $525.00, and thus the Defendant under his own best case scenario should have known he had no more than $1,226.06 in the account when the check was written. This would still leave a shortfall of $2,000.00. Another added element here was that the Defendant stopped payment, thus further distinguishing the facts here from the simple NSF check case as even though there were not sufficient funds in the account when the check was written, the Defendant could have placed sufficient funds therein thereafter.

Finally, the very next day after the check was written, the Defendant all but depleted the account by withdrawing $685.00 of the remaining $701.06 for his own personal use rather than paying these funds to the Plaintiff by stopping payment and issuing a check for the balance in the account, and making arrangements to pay the balance.

This overall conduct by the Defendant evinces to this Court an intent to deceive the Plaintiff from the time the Plaintiff told the Defendant he could place the insurance check in his own account rather than endorse it over to the Plaintiff, and thus goes beyond the mere issuance of a check against an account that has insufficient funds therein which, standing alone, would be a dischargeable debt. The Court perceives a course of conduct whereby Defendant indicated to the Plaintiff that the insurance proceeds had been received and would be earmarked for the payment of the repairs, followed immediately by a subsequent systematic scheme to deplete the account for other purposes so that there were insufficient funds to cover the check. These representations by the Defendant were fraudulent.

Accordingly, this Court funds said debt to be nondischargeable pursuant to § 523(a)(2)(A) in the principal sum of $3,429.58.

Ancillary obligations such as attorney's fees and interest may attach to the primary debt; consequently their status depends on that of the primary debt. Thus when a debt is determined to be nondischargeable, the attendant attorney's fees, interest and costs are also nondischargeable. *Klingman v. Levinson*, 831 F.2d 1292, 1296–1297 (7th Cir.1987), *citing, In re Hunter*, 771 F.2d 1126, 1131 (8th Cir.1985), and *In re Foster*, 38 B.R. 639, 642 (Bankr. M.D.Tenn.1984). *See also, Matter of Church*, 69 B.R. 425, 435–436 (Bankr.N.D. Tex.1987).

When a federal judgment is based on a state law claim, as here, the Court must look to state law to determine the propriety of prejudgment interest on recovery. *The Travelers Insurance Company v. Transport Insurance Company*, 846 F.2d 1048 (7th Cir.1988). Thus as to prejudgment interest the Court will apply I.C. 28–2–8–1(a)(1).

However, federal law governs as to post judgment interest on a federal judgment. *Id. See* 28 U.S.C. § 1961(a).

The Plaintiff shall thus also be awarded interest pursuant to I.C. 28–2–8–1(a) at the rate of 18% per annum from the date of execution of the check or June 30, 1988 to the date of this judgment.

The Plaintiff did not prove up attorney fees which are awardable under I.C. 28–2–8–1(a)(2), and shall not be included in this judgment.

It is therefore

ORDERED, ADJUDGED, AND DECREED that the indebtedness of the Defendant to the Plaintiff in the principal sum of $3,459.28, plus interest at the rate of 18% from July 1, 1988 to the date of this judgment, and post-judgment interest pursuant to 28 U.S.C. § 1961(a), or the coupon issue yield of a 52 week treasury bill settled immediately before judgment or 7.17% per annum, together with costs be held nondischargeable.