**In the Matter of Rick Douglas GROSS, Debtor.**

**BOBILYA CHRYSLER, PLYMOUTH, DODGE, INC., Plaintiff,**

v.

**Rick Douglas GROSS, Defendant.**

Bankruptcy No. 93–31478.
Adv. No. 93–3125.

United States Bankruptcy Court,
N.D. Indiana,
South Bend Division.

Nov. 30, 1994.

278

Richard K. Muntz, LaGrange, IN, for plaintiff.

R. William Jonas, Jr., South Bend, IN, for debtor/defendant.

### DECISION and ORDER

ROBERT K. RODIBAUGH, Bankruptcy Judge.

On September 28, 1993, Bobilya Chrysler, Plymouth, Dodge, Inc. ("Bobilya Chrysler"), Plaintiff, filed its COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT ("Complaint") against Rick Douglas Gross ("Gross"), Debtor herein. At the beginning of trial on the Complaint, counsel for Bobilya Chrysler moved orally to amend the pleadings to conform to the evidence. Following the trial, Bobilya Chrysler filed a written MOTION TO CONFORM PLEADINGS TO THE EVIDENCE ("Motion"). The court held a hearing on this Motion on October 27, 1994, after which time both Bobilya Chrysler's Complaint and its oral and written motions were taken under advisement.

### Jurisdiction

Pursuant to 28 U.S.C. § 157(a) and Northern District of Indiana Local Rule 200.1, the United States District Court for the Northern District of Indiana has referred this case to this court for hearing and determination. After reviewing the record, the court determines that the matter before it is a core proceeding within the meaning of § 157(b)(2)(I), over which the court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) and 1334. This decision and order shall serve as findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52, made applicable in this proceeding by Federal Rules of Bankruptcy Procedure 7052 and 9014.

### Background

Bobilya Chrysler was one of a number of dealerships which supplied van chassis to Wheel Master, Inc. ("Wheel Master").[1]

---

1. Bobilya Chrysler supplied the van chassis to Wheel Master, Inc. Additionally, the evidence establishes that payments for the van chassis were written on Wheel Master, Inc. corporate checks. Thus, at first blush it appears to the court that the amount owing may be a corporate

Wheel Master, which was started in July of 1978 and incorporated January 1, 1979, by its president and shareholder Gross, operated as a van conversion business. As a van converter, Wheel Master would receive a raw van body and chassis containing no inside treatment. It would then install various items ranging from basic seats, carpet and windows to whatever other equipment the purchaser might order. Wheel Master would then sell the converted vans to another entity.

Bobilya Chrysler and Wheel Master first began conducting business in February of 1992. According to the testimony of Donald Bobilya, president and owner of Bobilya Chrysler, Bobilya Chrysler had no reservations about doing business with Wheel Master after learning that Wheel Master was a member of the General Motors pool. Donald Bobilya testified that in the van conversion industry this meant that both General Motors trusted the van converter, and that the van converter was solvent.

The trial testimony of both Gross and Donald Bobilya established that in late February of 1992, Gross called Donald Bobilya and asked to purchase three van chassis. Donald Bobilya testified that Gross told him that Parkway Dodge, a Dodge dealership in Alabama, agreed to purchase the three converted vans from Wheel Master. According to Donald Bobilya, the van chassis were sold to Wheel Master at invoice price.[2] Additionally, the paperwork on the vans provided that Parkway Dodge was the owner of the vans. [Defendant's Exhibits A–T.] Donald Bobilya further testified that he and Gross reached an agreement on the payment plan for the three van chassis. According to the testimony of both Gross and Donald Bobilya, Wheel Master would pay Bobilya Chrysler for the van chassis by way of postdated checks out of the company's Lake City Bank operating account. By postdating the checks Wheel Master could then deposit the checks it re-

ceived from Parkway Dodge, creating funds to cover the checks already issued by Wheel Master to Bobilya Chrysler. Finally, according to the testimony of Donald Bobilya there were no problems with payments for the van chassis purchased by Wheel Master in February of 1992. Wheel Master next dealt with Bobilya Chrysler in March of 1992. According to the testimony of Donald Bobilya, Wheel Master had a Dodge dealer in Florida who wanted to buy two van chassis. However, unlike the earlier transactions between Bobilya Chrysler and Wheel Master, the dealer from Florida bought the van chassis directly from Bobilya Chrysler.

Later that year, on or before June 1, 1992, Parkway Dodge asked Wheel Master to convert two more Dodge van chassis. As it had done in February, Wheel Master looked to Bobilya Chrysler to meet Parkway Dodge's request. At trial Donald Bobilya testified that he was reluctant to sell two van chassis to Wheel Master because of the current state of the van chassis industry. Donald Bobilya testified that during the spring of 1992 the supply of van chassis was simply not meeting their demand. As a result, Bobilya Chrysler opted to provide each of its purchasers with a percentage of the van chassis it had in stock, based on the amount of business the purchaser had conducted with Bobilya Chrysler over the year. According to Donald Bobilya, based on Wheel Master's percentage of purchases it was only entitled to receive one van chassis. However, after Gross assured Donald Bobilya that Parkway Dodge would pay $100 above the invoice price on one of the van chassis, Bobilya Chrysler agreed to the sale of the second van chassis. [Plaintiff's Exhibits 1–6.]

The paperwork on the two van chassis indicates that unlike the earlier transactions involving Parkway Dodge, this time Wheel Master was listed as the owner of the van

debt rather than Gross's personal liability. However, Gross listed the debt on his bankruptcy schedules and does not assert that he should not be personally responsible. The court notes that the corporate entity may be disregarded in order to protect innocent third parties from fraud or injustice when transacting business with a corporation.

2. Donald Bobilya testified that generally Bobilya Chrysler would offer this discounted price to their larger customers. According to Donald Bobilya, when a dealer sold a van chassis at invoice, it got a 3% rebate of the invoice price from Chrysler. This invoice price was not paid if one of Chrysler's dealers bought the vans from another dealer.

chassis. [Id.][3] According to the record and the evidence presented at trial, the first transaction took place on June 1, 1992, with Wheel Master paying by check in the amount of $16,009.40, while the second transaction occurred on June 5, 1992, with Wheel Master paying by check in the amount of $15,909.40.[4] Just as the previous transactions had been financed by way of postdated checks, so too were the June 1, 1992 and June 5, 1992 transactions. The evidence showed that the first check was postdated for June 3, 1992, while the second check was postdated for June 8, 1992. [Plaintiff's Exhibits 6 and 15.] The evidence further showed that when Wheel Master received the check from Parkway Dodge for the first van chassis on June 2, 1992, it immediately deposited that check in its Lake City Bank operating account. [Plaintiff's Exhibit 18.] However, when Wheel Master received the check from Parkway Dodge for the second van chassis, it deposited that check into its other Lake City Bank account. [Plaintiff's Exhibit 19.] That account was used by Wheel Master to meet rental payment requirements as well as payroll expenses.

Just after Wheel Master provided Bobilya Chrysler with the checks for the two van chassis, Wheel Master experienced a complete state of disarray. According to the testimony of Gross, during the afternoon of June 5, 1992, General Motors Acceptance Corporation ("GMAC") ordered Wheel Master to cease production pending the outcome of an investigation into allegations that Wheel Master vans were being exported in violation of GMAC's established policies. Additionally, Wheel Master's controller, Scott Rhud ("Rhud"), left the company without notice on June 8, 1992. According to the testimony of Gross, not only did one of the company's computers leave with Rhud, but for all practical purposes with him went the company's ability to gain access to the company's computer-generated check ledger and other financial information. Gross testified

that as a result of this situation he was unable to determine how many postdated checks the company had outstanding. Finally, Gross testified that once word surfaced in the van conversion industry that GMAC was spending quite a bit of time at the Wheel Master plant, several of the company's creditors in possession of postdated checks began to present these checks prior to the dates listed on the checks. [Defendant's Exhibits W, X, Y and Z.] As a result of this creditor upheaval, when Bobilya Chrysler presented the first Wheel Master check it was returned because Wheel Master had insufficient funds in its Lake City Bank operating account.

Because of these problems, Gross consulted with corporate counsel, Michael DeBoni ("DeBoni"). According to Gross, DeBoni advised him that he needed to both get control over his bank account and to take the necessary steps to keep Wheel Master in operation. Gross testified that based on the advice of DeBoni he stopped making deposits in Wheel Master's Lake City Bank operating account, instead depositing all incoming funds into the Lake City Bank payroll account. Therefore, when Wheel Master received the check from Parkway Dodge for the second van chassis on June 8, 1992, Gross deposited it in the Lake City Bank payroll account. Gross testified that he contacted Paul Fuhrman at Bobilya Chrysler early in the morning on June 8, 1992, to ask for additional time to cover the second check Wheel Master had written to Bobilya Chrysler. However, despite the prior financial arrangement between Bobilya Chrysler and Wheel Master, whereby Bobilya Chrysler agreed to wait until June 8, 1992, to present the second check, Bobilya Chrysler had deposited the second check two days earlier. Thus, when Bobilya Chrysler presented the check from Wheel Master it was dishonored because of insufficient funds.

However, after both checks had been returned to Bobilya Chrysler because of insufficient funds, Wheel Master wrote checks to

---

3. According to the testimony of Donald Bobilya this was done so Bobilya Chrysler could receive the 3% rebate from Chrysler for the sale of the van chassis at invoice price.

4. While the original sale agreement between Parkway Dodge and Wheel Master called for Wheel Master to convert the van chassis, when that later became impossible Parkway Dodge simply requested that Wheel Master ship the van chassis to its dealership in Alabama.

Gross for the April through June rents totalling $12,600[5] and a check for $1,394.60 to replace two prior insufficient funds payroll checks. [Plaintiff's Exhibits 22 and 23.] Gross testified that these payments were made so that Wheel Master could continue its daily business operations. According to Gross, he had every intention of keeping the business in operation. Finally, Gross testified that Wheel Master sent a cashiers check to Bobilya Chrysler on June 27, 1992, in the amount of $3,000, in an effort to demonstrate that it was Wheel Master's intent to make good on its responsibilities to Bobilya Chrysler.[6]

Bobilya Chrysler has asked that the court not only except Gross's debt from discharge, but that the court also award it attorney fees. [Complaint # 13.] Contrarily, Gross argues that this court should not only deny Bobilya Chrysler's Complaint, but should also require Bobilya Chrysler to pay Gross's attorney fees.

### Discussion

■ Before addressing the substance of Bobilya Chrysler's Complaint the court must first determine whether Bobilya Chrysler may amend its Complaint to include any allegation of "false representations" made by Gross as defined under § 523(a)(2)(A).[7] In opposition of this Motion, counsel for Gross argues that both Bobilya Chrysler's Complaint and the Pre–Trial Order agreed on by the parties clearly indicate that Gross's actions only constituted "false pretenses" and not "false representations." Specifically, Gross's attorney relies on language from the

Pre–Trial Order which provided in pertinent part:

13. Defendant's representations that the checks would be honored upon presentment were false and were known by the Defendant to be false when made, and were made by the Defendant to the Plaintiff with the intent to defraud the Plaintiff into passing ownership of the vans so that Wheel Master could immediately liquidate them for cash equivalent....

16. The debt to the Plaintiff arose by reason of false pretenses, and is non-dischargeable under 11 U.S.C. Section 523(a)(2)(A).

[Pre–Trial Order, Plaintiff's claims, 13 and 16.] Counsel for Gross relies on *Leeb v. Guy (In re Guy)*, 101 B.R. 961 (Bankr.N.D.Ind. 1988) for the proposition that "false pretenses" and "false representations" have two separate and distinct meanings. In *Guy*, the court defined a "false pretense" as involving an "implied misrepresentation or conduct intended to create and foster a false impression," while defining a "false representation" as an express misrepresentation. *Id.* at 978.

However, counsel for Bobilya Chrysler argues that pursuant to Federal Rule of Civil Procedure 15(b), incorporated in Bankruptcy Rule 7015(b), a party may amend its complaint based on evidence presented at trial "when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits." Fed. R.Bankr.P. 7015(b) (Callaghan 1993–94). Counsel for Gross argues that Gross will be

---

5. According to the testimony of Gross, pursuant to agreement between the landlord of the property, Wallace Yoder ("Yoder") and Gross, Wheel Master was in the process of buying the property from Yoder. Pursuant to the terms of the agreement, Gross was paying Yoder $4,200 a month, and Yoder was responsible for paying the mortgage holder, Midwest Commerce Bank, and the land contract holder.

6. After Gross's payment of $3,000 to Bobilya Chrysler by certified check on June 27, 1992, the extent of Gross's obligation on the van chassis purchased from Bobilya Chrysler on June 1, 1992, and June 5, 1992, was $28,918.80. [Defendant's Exhibit AA.]

7. Section 523(a)(2)(a) provides in pertinent part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
(2) for money, property, services or an extension, renewal or refinancing of credit, to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A) (Callaghan 1993–94).

unduly prejudiced if Bobilya Chrysler is allowed to amend its Complaint to include "false representations" as provided in § 523(a)(2)(A) of the Bankruptcy Code. Counsel for Gross asserts that had Bobilya Chrysler originally plead "false representations" in its Complaint, he would have deposed Donald Bobilya. He argues that if this court grants Bobilya Chrysler's Motion to amend its Complaint and relies on the evidence presented at trial Gross's position will be severely jeopardized.

While Federal Rule of Civil Procedure 15, as incorporated under Bankruptcy Rule 7015, generally favors liberal amendment of pleadings in order to insure consideration of claims on their merits, in some circumstances courts have determined that granting a leave to amend a complaint is inappropriate. *In re Stavriotis*, 977 F.2d 1202, 1204–05 (7th Cir.1992); *Amendola v. Bayer*, 907 F.2d 760, 764 (7th Cir.1990). The Supreme Court in *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) stated:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave should as the rules require be "freely given."

Finally, the decision on a motion for leave to amend falls within the sound discretion of the Bankruptcy Judge. *See In the Matter of Unroe*, 937 F.2d 346, 350 (7th Cir.1991); *Deasy v. Hill*, 833 F.2d 38, 40 (4th Cir.1987), *cert. denied* 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 483; *In re International Horizons, Inc.*, 751 F.2d 1213, 1216 (11th Cir.1985); *In re Lanman*, 24 B.R. 741, 743 (Bankr.N.D.Ill. 1982).

After careful consideration of this issue, the court denies Bobilya Chrysler's Motion to amend its Complaint. First, the court notes that the purpose behind permitting amendments to pleadings is to "enable a party to assert matters that were overlooked or were unknown to him at the time he interposed his original complaint and answer." *Stavriotis*, 977 F.2d at 1206, *quoting* Wright, Miller and Kane, *Federal Practice and Procedure*, § 1473 (1971). In the court's opinion, this is not a simple case of a party overlooking a particular claim. During the course of discovery in this proceeding, Bobilya Chrysler's attorney could have determined the effectiveness of a claim for "false representations" against Gross. Apparently, both at the time of the Complaint and the Pre–Trial Order, Bobilya Chrysler determined that its best course of action was a claim for only "false pretenses" against Gross. It was not until right at the time of the trial that Bobilya Chrysler determined that it would be better situated by adding the claim of "false representation" to its original Complaint.

Additionally, the court concludes that Gross would be unduly prejudiced if Bobilya Chrysler were allowed to amend its Complaint so late in the proceedings. Based on the Complaint filed and the Pre–Trial Order issued it was clear that Bobilya Chrysler was relying on the "false pretenses" portion of § 523(a)(2)(A), and not the "false representation" portion of that section. As previously noted these two provisions are distinct. One involves an implied representation, while the other is expressed, either oral or written. If this court were to grant Bobilya Chrysler's Motion at this juncture, it would severely hinder Gross's defense. The court is in agreement with Gross, that had this trial concerned the "false representation" portion of § 523(a)(2)(A) as well as the "false pretenses" portion of that section, Gross's attorney would have conducted additional discovery in researching the issue.

Therefore, in determining the outcome in this matter, the court will only need to consider Bobilya Chrysler's claim that Gross committed "false pretenses", by writing checks from an account which had insufficient funds. To prevail on a non-dischargeability claim under § 523(a)(2)(A), a plaintiff must prove:

1. That the debtor obtained the money (property or services) through representations which the debtor either knew to be false or made with such reckless disregard for the truth as constitutes a willful misrepresentation;

2. That the debtor possessed scienter, i.e. an intent to deceive; and

3. That the creditor relied on the false representation and the reliance was reasonable.

*First National Bank of Red Bud v. Kimzey (In re Kimzey),* 761 F.2d 421, 423 (7th Cir. 1985). As to each of these elements the creditor bears the burden of proof and must prove each element by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 289–90, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991), *rev'g In re Garner,* 881 F.2d 579 (8th Cir.1989). Moreover, the discharge provisions of § 523 will be strictly construed against the creditor and liberally construed in favor of the debtor. *Illinois Dept. of Employment Sec. v. Winston (In re Winston),* 114 B.R. 566, 570 (Bankr.N.D.Ill.1990); *Sears Roebuck and Company v. Faulk (In re Faulk),* 69 B.R. 743, 748 (Bankr.N.D.Ind. 1986). Finally, whether a debt is nondischargeable pursuant to § 523 is a matter of federal rather than state law. *Brown v. Felsen,* 442 U.S. 127, 129–30, 99 S.Ct. 2205, 2208–09, 60 L.Ed.2d 767 (1979); *Kline's Service Center, Inc. v. Fitzgerald (In re Fitzgerald),* 109 B.R. 893 (Bankr.N.D.Ind.1989).

■ There has been a split in authorities as to whether or not passing a bad check creates a presumption of a "false pretense" within the meaning of § 523(a)(2)(A). One view holds that the issuance of a check carries with it an implied representation by the issuer that it will be honored or that there will be sufficient funds available to cover the check. *See Georgia Casualty and Surety Co. v. Miller (In re Miller),* 112 B.R. 937, 940 (Bankr.N.D.Ind.1989); *In re Almarc Mfg., Inc.,* 62 B.R. 684, 689 (Bankr.N.D.Ill.1986); *In re Perkins,* 52 B.R. 355, 357 (Bankr. M.D.Fla.1985); *In re Mullin,* 51 B.R. 377, 378 (Bankr.S.D.Ind.1985). Bobilya Chrysler asks the court to adopt this position. It argues that Indiana Code § 35–43–4–4(e) ad-

heres to this position. That code section provides in pertinent part:

(e) . . . a person who has insufficient funds in or no account with a drawee credit institution and who makes, draws, or utters a check, draft, or order for payment on the credit institution may be inferred:

(1) to have known that the credit institution would refuse payment upon presentment in the usual course of business; and

(2) to have intended to deprive the owner of any property acquired by making, drawing, or uttering the check, draft, or order for payment of a part of the value of that property.

Ind.Code Ann. § 35–43–4–4(e) (Burns 1994).

■ However, as previously indicated, when determining the issue of dischargeability, the court is required to look to federal law and not state law. *Felsen,* 442 U.S. at 129–30, 99 S.Ct. at 2208. In looking to federal law, based on the Supreme Court's decision in *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), and the Seventh Circuit Court of Appeals' decision in *Goldberg Securities, Inc. v. Scarlata (In re Scarlata),* 979 F.2d 521 (7th Cir.1992), the court concludes that the correct position is the view which recognizes that a check is neither a statement, nor a representation as to whether it will be honored upon presentment.

In *Williams* the Supreme Court ruled that knowingly passing a bad check does not represent a "false statement" within the meaning of 18 U.S.C. § 1014. *Williams,* 458 U.S. at 284, 102 S.Ct. at 3091. The court observed that "a check is not a factual assertion at all"; a check "serve[s] only to direct the drawee banks to pay the face amount to the bearer." *Scarlata,* 979 F.2d at 525, *citing Williams,* 458 U.S. at 284, 102 S.Ct. at 3091. While the Seventh Circuit Court of Appeals in *Scarlata* recognized that the *Williams* decision concerned a criminal statute, the court determined that the reasoning of the Supreme Court governed the decision over whether an insufficient fund check written in a civil bankruptcy proceeding represents proof of a "false pretense" within the mean-

ing of § 523(a)(2)(A). *Scarlata,* 979 F.2d at 525.

▇ This court concludes that Bobilya Chrysler has simply not proven that Gross's actions of postdating the checks to Bobilya Chrysler during the first week of June 1992 constituted "false pretenses" within the meaning of § 523(a)(2)(A). In looking at both the record and the testimony in this case, the court concludes that when Bobilya Chrysler entered into the two separate transactions on June 1, 1992, and June 5, 1992, with Wheel Master, Gross had every intention of paying Bobilya Chrysler for the two van chassis which were purchased from them. Even though the checks from Wheel Master to Bobilya Chrysler were postdated June 3, 1992, and June 8, 1992, this act did not signify an intent on the part of Gross to commit fraud against Bobilya Chrysler. In fact, both Donald Bobilya and Gross testified that Wheel Master's practice of postdating checks to Bobilya Chrysler was an acceptable financing arrangement which both parties had assented to in an earlier transaction.

It was not unforeseeable that Wheel Master would lack sufficient capital to pay for the van chassis it received from Bobilya Chrysler on June 1, 1992, and June 5, 1992. The evidence is quite clear that throughout the course of dealings between Wheel Master and Bobilya Chrysler, Wheel Master had to wait for checks from its van conversion customers, before obtaining sufficient funding to pay for the van chassis. It was an unfortunate state of events for Wheel Master which caused the insufficient funds situation to occur. As indicated in the record and testified to by Gross, shortly after the arrangements for the van chassis had been made GMAC ordered Wheel Master to stop operations. As a result of the actions taken by GMAC, the creditors of Wheel Master became concerned and started cashing in their postdated checks before the dates indicated on the checks. Consequently, Wheel Master had insufficient funds to cover the first check it had issued to Bobilya Chrysler on June 1, 1992.

▇ As for the second insufficient fund check, Bobilya Chrysler argues that Gross committed fraud by depositing the check it received from Parkway Dodge on June 8, 1992, into its payroll account, instead of the account from which it had written the check to Bobilya Chrysler. The court concludes this action simply does not constitute an intent to deceive on the part of Gross. Even the fact that Gross used the money from the payroll account to make rental payments for the months April through June 1992, as well as making company payroll payments, after learning the checks from Bobilya Chrysler had been returned because of insufficient funds does not establish an intent to deceive on the part of Gross. While it is true that a court may look to a promissor's subsequent conduct to assist in determining the promissor's intent at the time he entered into the original transaction, the law is clear that the alleged fraud must exist at the inception of the debt and will not change based on future actions on the part of the debtor. *Guy,* 101 B.R. at 979; *In re Todd,* 34 B.R. 633, 635 (Bankr.W.D.Ky.1983); *In re Kelsey,* 9 B.R. 154, 157 (Bankr.W.D.Ky.1981).

The key focal point for the court is on Gross's intent when he wrote the checks to Bobilya Chrysler on June 1, 1992, and June 5, 1992. The events which occurred after Gross wrote the checks to Bobilya Chrysler simply do not illustrate that it was Gross's intention to defraud Bobilya Chrysler when he wrote the checks for the two van chassis. These actions were simply the actions of an individual whose business was thrown into an unfortunate state of affairs. The acts of Gross in depositing the funds from Parkway Dodge into the payroll account, instead of Wheel Master's operating account, and his actions of paying the April through June 1992 rental payments as well as the payroll expenses, after learning the checks to Bobilya Chrysler had been returned due to insufficient funds, represent nothing more than an individual trying to save his business. Certainly, these are not the actions of a man intending to deceive his creditors. Therefore, the court concludes that Bobilya Chrysler has simply not met its burden of proof in establishing that Gross's actions constituted "false pretenses" within the meaning of § 523(a)(2)(A).

■ Even assuming it was necessary for the court to consider Bobilya Chrysler's potential "false representation" claim, the court concludes that Bobilya Chrysler did not meet its burden of proof. When Gross and Bobilya Chrysler entered into these transactions on June 1, 1992, and June 5, 1992, any statements made by Gross concerning payment of the van chassis did not constitute a "false representation." As has been previously discussed, the evidence shows that when Gross made the deals with Bobilya Chrysler on June 1, 1992, and June 5, 1992, he had every intention of paying for those van chassis upon receipt of payment from Parkway Dodge. In February 1992 when Wheel Master and Bobilya Chrysler first conducted business they did so by way of postdated checks. After having been made aware of Wheel Master's financial constraints, Bobilya Chrysler agreed to accept payment, after Wheel Master had been paid for the converted vans from Parkway Dodge. There was no indication that the June 1, 1992, and June 5, 1992 transactions were any different. Based on the prior transactions between the two parties, Bobilya Chrysler knew that it would have to wait until the date on the postdated checks before it could receive payment from Wheel Master for the van chassis. It was only due to the occurrence of the unforeseeable events previously mentioned, and not any fraudulent activity on the part of Gross, that Wheel Master became delinquent on its obligations to Bobilya Chrysler.

Accordingly, Bobilya Chrysler's MOTION TO CONFORM EVIDENCE TO PLEADINGS is DENIED. Additionally, Bobilya Chrysler's Complaint seeking exception of Gross's debt due it from his discharge is DENIED. Said debt is discharged. The court having denied Bobilya Chrysler's Complaint, will therefore not consider Bobilya Chrysler's request for attorney fees.

■ Absent agreement of a statutory requirement, federal law requires that a party is not entitled to attorney fees unless they can prove the opposing party acted "in bad faith, voraciously, wantonly, or for oppressive reasons." *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). The court finds that Bobilya Chrysler has simply not proven that Gross's conduct rose to the level of bad faith or wanton behavior, and therefore DENIES Bobilya Chrysler's request for attorney fees. Gross has not met his burden of proof. Therefore, the court will not award him attorney fees. It is

SO ORDERED.